557 So.2d 161 (1990)
Lawrence P. BROWN and Ada L. Brown, As Personal Representatives of the Estates of Judith A. Brown, Deceased, and Susan A. Brown, Deceased, and On Behalf of Survivors, Lawrence P. Brown and Ada L. Brown, Individually, As Parents of Judith A. Brown, Deceased, and Susan A. Brown, Deceased, Appellants,
v.
CITY OF PINELLAS PARK, a Municipal Corporation, City of Kenneth City, a Municipal Corporation, and Everett S. Rice, As Sheriff of Pinellas County, Florida, Appellees.
No. 89-01342.
District Court of Appeal of Florida, Second District.
February 16, 1990.
*162 Stevan T. Northcutt of Levine, Hirsch, Segall & Northcutt, P.A., Tampa, for appellants.
C. Wade Yeakle, III of Yeakle and Watson, P.A., St. Petersburg, for appellee City of Pinellas Park.
James E. Thompson of Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, for appellee City of Kenneth City.
Susan H. Churuti, Co. Atty., and Howard M. Bernstein, Senior Asst. Co. Atty., Clearwater, for appellee Everett S. Rice.
LEHAN, Acting Chief Judge.
This appeal is from the dismissal with prejudice of appellants' second amended complaint for wrongful death. The dismissed complaint alleged negligence of law enforcement officers in their motor vehicle pursuit of a lawbreaker which led to the deaths of two innocent bystanders. We reverse.
Appellants, as the parents and personal representatives of the estates of decedents Judith A. Brown and Susan A. Brown, filed suit against appellees, the Pinellas County Sheriff's Department, the City of Pinellas Park, and Kenneth City. The second amended complaint alleged that various law enforcement officers employed by the three different appellees negligently and carelessly conducted a high speed pursuit of a traffic law violator named John Deady after he had driven through a red light. It is alleged that the pursuit caused the deaths of appellants' decedents when Deady's vehicle broadsided their vehicle as it was crossing an intersection.
The three appellees moved to dismiss, arguing that (1) no duty was owed to the decedents which was breached by the officers, (2) the appellees are protected by the doctrine of sovereign immunity, and (3) the deaths were proximately caused by Deady, not the officers. The trial court granted the motions and dismissed the second amended complaint with prejudice. Appellants' three points on appeal dispute the validity of each of appellees' foregoing three arguments.
*163 We agree with appellants as to each of the points on appeal. In summary, we hold that allegations of
 a continued, high speed, night, vehicular pursuit covering a total distance of over twenty-five miles in a densely populated area
 by law enforcement personnel ultimately totaling fifteen officers
 of a person who had run a red light and who during the pursuit disregarded approximately thirty-four traffic control signals before his disregard of the next one resulted in his vehicle colliding at an intersection with a vehicle occupied by appellants' decedents
pleaded a breach of duty owed by the officers to innocent bystanders like appellants' decedents to which the doctrine of sovereign immunity does not apply. While the mere initiation of such a pursuit, i.e., the fact of there being a pursuit which results in injuries to innocent bystanders, is not actionable, the manner of its continuation may be actionable under circumstances like those here which are alleged to have put the pursuing officers on clear notice of impending danger to innocent bystanders which could have been avoided by terminating the pursuit. Also, allegations of the failure of one of the officers to warn appellants' decedents of the impending danger when, under circumstances described below, he had the opportunity to do so and was on clear notice that they were about to be exposed to the danger pleaded a breach of duty on his part to which the doctrine of sovereign immunity does not apply. We further hold that whether the deaths were proximately caused by Deady, not the officers, or any of them, is for the jury to decide.
Thus, we conclude that the second amended complaint should not have been dismissed. The effect of our reversal at this pleadings stage is, of course, only that appellants shall not be precluded as a matter of law from having the opportunity to establish their case by proving their allegations.
The facts of this case are unusual, and applicable case law as a whole has been somewhat imprecise and in some cases susceptible of differing interpretations. Therefore, to explain our reversal adequately it is necessary to spell out our reasoning. In so doing the remainder of this opinion is organized as follows: I., a full description of the alleged facts; II., an analysis of applicable case law; and, III., an outline of policy considerations and reasons why Florida Supreme Court review of this case appears appropriate.
We have restricted case law analysis essentially to A. the case containing the most recent Florida Supreme Court pronouncements of the broad principles governing particularly the first two points on appeal concerning duty and sovereign immunity, Kaisner v. Kolb, 543 So.2d 732 (Fla. 1989), B. factually analogous Florida appellate cases, i.e., those involving law enforcement motor vehicle pursuits of lawbreakers resulting in injury or death to innocent bystanders, and C. authority that the proximate cause issue of the third point on appeal is for the jury.

I. FACTS
A rather full description of the alleged facts is appropriate to show why this case is different in our view from all reported Florida cases in which governmental entities have been sued for motor vehicle pursuits by law enforcement officers of lawbreakers which resulted in injury or death to innocent bystanders. The reason is that the alleged facts of this case present a more egregious case for governmental liability than do those shown by the opinions in any of the other such cases, whether the results thereof were for or against liability. Accordingly, all factually analogous Florida case law is, we conclude, either fully supportive of or reconcilable with our reversal, as will be explained in section II below.
The second amended complaint, which for purposes of the motions to dismiss must be accepted as true, alleges the following facts.
On June 24, 1984, shortly before 1:00 a.m., John Deady drove through a red light at the intersection of Pasadena Avenue and Park Street in Pasadena, Florida. Pinellas *164 County Sheriff's Deputy Kenneth Rico witnessed the offense and gave chase north on Pasadena Avenue. The two sped past the merger of Pasadena Avenue and 66th Street, continuing north.
Near the intersection of 66th Street and 38th Avenue in Kenneth City, a Kenneth City police officer and two more sheriff's deputies joined the pursuit, each in a different car. Disregarding traffic lights, the group sped northbound on 66th Street, allegedly a busy road. The speeding caravan picked up another Kenneth City officer at 54th Avenue and crossed into the city of Pinellas Park, where a police officer from that city joined the pursuit. Deady and his pursuers, then numbering six, continued rapidly due north on 66th Street.
Another Pinellas Park officer joined the pursuit at Park Boulevard and yet another joined at 102nd Avenue. Three more sheriff's deputies joined at Bryan Dairy Road, 118th Avenue, and State Road 688, respectively. The caravan, then including eleven officers, approached the merger of 66th Street and U.S. 19 at speeds from 80 to 120 miles per hour. When the caravan entered U.S. 19 and passed Enterprise Road and then State Road 586, an additional sheriff's deputy joined in at each intersection.
By 1:07 a.m., approximately thirteen minutes after Deady had initially run the red light at Pasadena Avenue and Park Street, the pursuers, then including fourteen law enforcement officers, continued after Deady north on U.S. 19 toward its intersection with State Road 584.
Waiting at the intersection of U.S. 19 and State Road 584 in his unmarked patrol car to join in active pursuit was Sheriff's Corporal Daniel Rusher. Rusher, whose vehicle was in the westbound, right-turn lane of State Road 584 facing a red light, had been alerted to the pursuit by radio. In the lane to his left, the through lane, another vehicle was waiting for the light to change and was observed by Rusher. When the light turned green, Rusher made a right turn onto U.S. 19, positioning himself to follow when Deady passed. As the other vehicle proceeded to cross the intersection, Deady's vehicle ran the red light and struck the other vehicle broadside at about 90 miles per hour. Deady died instantly, as did twenty-three year old Susan Brown, an occupant of the other vehicle. Susan's twenty year old sister Judith, another such occupant, died three days later.
It is alleged that the pursuit had "covered a distance in excess of 25 miles through a densely populated urban area on highways generally frequented by heavy vehicular traffic ... throughmore [sic] than 34 traffic control devices in disregard of the signals in effect... ."
It is further alleged that "an order to terminate the pursuit had been given by a supervisor [apparently employed by the Pinellas County Sheriff's Department] which was disregarded...." There is no allegation as to who heard, or should have heard, the order; as to whether the order was, or could have been, heard by officers other than those employed by the governmental entity which employed the supervisor; and at what point during the pursuit the order was given.

II. CASE LAW
In reversing we rely, as we have said, upon A. the Florida Supreme Court's recent decision in Kaisner, and B. cases involving law enforcement motor vehicle pursuits of lawbreakers which resulted in injury or death to innocent bystanders. The basic, underlying rationale for our reversal is that the second amended complaint may be taken to allege the creation by law enforcement officers of a situation in which injuries to innocent bystanders like appellants' decedents could have been foreseen by the officers as being likely and were easily avoidable.

A. Kaisner

The supreme court's decision in Kaisner, we conclude, calls for a reversal particularly on the basis of the foregoing points (1) and (2) which concern the issues of duty and sovereign immunity. We address the duty issue first because analytically the sovereign immunity issue "does not even arise until it is determined that a [governmental] defendant otherwise owes a duty of care to the plaintiff... ." *165 Id. at 734 (quoting Williams v. State, 34 Cal.3d 18, 22, 192 Cal. Rptr. 233, 235, 664 P.2d 137, 139 (1983), quoting, in turn, Davidson v. City of Westminster, 32 Cal.3d 197, 185 Cal. Rptr. 252, 649 P.2d 894 (1982)).
In Kaisner, petitioner's vehicle was pulled over and stopped by sheriff's deputies in the curb lane of a street for an expired inspection sticker. After petitioner had stepped outside of and stood behind his vehicle which was in front of the deputies' vehicle, another vehicle struck the deputies' vehicle from behind. As a result, the deputies' vehicle was propelled forward toward petitioner's vehicle, striking petitioner. Petitioner's complaint alleged that the deputies breached a duty of care owed to petitioner by not using proper procedures in the stop, an allegation which was supported by an affidavit of an expert in police procedure. Citing earlier decisions that had found liability to persons injured after law enforcement officers had taken them into custody or otherwise detained them, Kaisner held that "petitioner was owed a duty of care by the police officers when he was directed to stop and thus was deprived of his normal opportunity for protection." Id. at 734. In more broad terms, Kaisner also ruled, "Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." Id. at 735.
Though Kaisner's facts differ from the instant facts in that appellants' decedents were not alleged to have been in the custody of any of the officers involved in the pursuit, the above-quoted principle concerning "a foreseeable zone of risk" appears applicable. Certainly it cannot be ruled as a matter of law at this pleadings stage that the conduct of appellees' officers did not create as to the decedents, and other innocent bystanders, a "foreseeable zone of risk." In Kaisner, as in this case, it was police action which allegedly created the risk. Thus, we cannot agree with the argument made by all three appellees that Kaisner has no application. It is specifically alleged in this case that the actions of the officers caused "unreasonably dangerous conditions to exist throughout the course of the chase" and, more particularly, that the officers of each appellee "negligently and carelessly engaged in a high speed pursuit ... and failed to terminate the pursuit once it became apparent Deady was not going to stop, thereby causing the pursuit to continue until its ultimate termination caused by the collision... ."
It is also alleged that Corporal Rusher, while waiting to join the pursuit actively, had a special duty to warn decedents of the high speed caravan; that decedents, waiting to cross the intersection, were foreseeable victims under the circumstances; and that Corporal Rusher was negligent in failing to warn them of a danger to which he knew or should have known they were about to be exposed. We conclude that under Kaisner and in light of other allegations these allegations sufficiently pleaded a duty owed by Corporal Rusher to decedents and breached.
Allegations that Corporal Rusher was, while next to plaintiffs' decedents at the intersection, waiting for Deady to pass and that he then pulled out onto U.S. 19 to get behind Deady when Deady was expected to pass manifestly indicate that he was in communication and coordination with the other officers. Thus, the second amended complaint sufficiently alleges that he was, although ahead of the fleeing lawbreaker, already effectively a part of the pursuit. He was involved in the effort to stop Deady in the same sense as would be an officer setting up a roadblock to intercept a pursued lawbreaker or an officer speeding ahead of a pursued lawbreaker on another route to intercept or get closer to him. To say that because Corporal Rusher had not yet actively engaged in the pursuit from behind he was not legally accountable for its consequences would, we conclude, relieve him of a responsibility which was properly his if the allegations are proved. His location ahead of Deady was the only place from which he could, from the information *166 he had as a part of the pursuit, have prevented those consequences.[1]
The allegations are therefore to the effect that Corporal Rusher subjected plaintiffs' decedents to what Kaisner referred to as a foreseeable zone of risk by failing to warn them of the fast approaching caravan, a danger which was particularly serious and easily avoidable, of which he was, or should have been, fully aware, and of which they apparently were totally unaware.
Corporal Rusher was alleged to have had a special duty in that he was the only officer involved in the pursuit who allegedly knew, or was on notice of, the danger to plaintiffs' decedents in particular, yet he allegedly did nothing to warn them in any way, such as with his vehicle's siren and verbally. See Herron v. Silbaugh, 436 Pa. 339, 260 A.2d 755, 758 (1970) which, while involving different circumstances, contains the following statements which are in point here:
[A] jury might properly have found that Silbaugh [a state police officer] did not give adequate warning to the driver [sic] of other cars (specifically, to Harkey [the plaintiff's decedent]) of the fact that he was in pursuit of a speed violator.
Moreover, Silbaugh did not offer any explanation of circumstances which might have necessitated his decision not to use his siren. The jury was properly permitted to find that this decision created an unreasonable risk that bodily harm would thereby result to another person, and that it was highly probable that such harm would ensue. In fact, the very reason why police cars are provided with sirens is to avoid the possibility that there might be an accident such as the one which occurred in this case.
See 57 Am.Jur.2d, Municipal, County, School, and State Tort Liability § 474 (1988) ("[W]here officers in pursuit create a foreseeable risk, not readily discoverable by endangered persons, they must warn persons at risk, which may involve sounding a siren and/or flashing warning lights."). See also Reed v. Winter Park, 253 So.2d 475 (Fla. 4th DCA 1971) (alleged failure of police officer to use siren during high speed pursuit created fact issue sufficient to defeat defendant's motion for summary judgment in negligence action).[2]
*167 If there were no legally cognizable duties of law enforcement officers under the alleged circumstances of this case, the officers would in effect have had virtually carte blanche authority to conduct and continue pursuits of lawbreakers in any manner they chose despite serious, clearly apparent, and easily avoidable dangers to innocent bystanders. That should not be, and is not, we conclude, the law in Florida, as we will further explain.
Indeed, it is also alleged that one of the three appellees had orally adopted a policy prohibiting high speed motor vehicle pursuits by law enforcement officers and that the other two had adopted written policies which effectively prohibited the continuation of the kind of pursuit involved here. Included among those allegations are the following:
(a) The CITY OF PINELLAS PARK'S policy was violated by failure to terminate the pursuit once the identity of the fleeing individual was known to the pursuing officer, the time of day and the amount of traffic on the street were such that pursuit of the fleeing vehicle was too dangerous, the fleeing vehicle was clearly outdistancing the pursuit vehicles, the seriousness of the crime was not such that it would warrant the risking of innocent bystanders, the officer or the occupants of the fleeing vehicle, and the number of vehicles involved in the vehicular pursuit in question constituted a procession of police vehicles following the fleeing vehicle all in violation of the vehicular pursuit policy as set forth in General Order Number 45. (b) The policy applicable to Defendant "SHERIFF COLEMAN" as Sheriff of PINELLAS COUNTY SHERIFF'S DEPARTMENT, was violated when the chase became a "caravan" type pursuit which became a danger to other citizens on the road, when the pursuing deputies failed to break off the pursuit when it became apparent that the area's citizenry was being endangered by hard pursuit, and the fact that the nature of the crime involving the person being pursued was a traffic violation and an order to terminate the pursuit had been given by a supervisor which was disregarded all in contravention of General Order A-9 applicable to the PINELLAS COUNTY SHERIFF'S DEPARTMENT. (c) The Defendant KENNETH CITY'S oral policy concerning police pursuits was violated when the members of the KENNETH CITY Police Department engaged in and became involved with the high speed chase which was in direct contravention of the oral policy applicable to them not to get involved in high speed chases.
See 57 Am.Jur.2d Municipal, County, School, and State Tort Liability § 471 (1988) ("Police department regulations, rules, and policies governing the operation of police vehicles in emergency situations contrary to the ordinarily prevailing traffic rules may be determinative of whether the conduct of particular officers may be considered negligent... ."). Cf. 57A Am.Jur.2d Negligence § 185 (1989) (industry customs or practices "often highly probative" in establishing a duty of care.).
Whether or not in this case the decisions of all those law enforcement officers joining the pursuit at various points along its route who were not involved for as long as was the officer who initially began it were of the same nature as that of the initial officer to continue the pursuit and therefore whether they all should bear responsibility for the consequences of the continued pursuit is a question of fact.
Concluding that appellants have sufficiently pleaded a breach by each appellee of a duty of care, we now address the sovereign immunity issue.[3] As to this issue, *168 Kaisner noted the general rule that "liability may exist when the act of the government or its agent is not discretionary, but operational in nature." 543 So.2d at 736. For tests by which to distinguish between "discretionary" and "operational," terms which Kaisner described with complete accuracy as "susceptible of broad definitions," id., Kaisner turned to case law from California and Washington adopted originally by the Florida Supreme Court in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979).
The California test, stated in Johnson v. State, 69 Cal.2d 782, 794, 73 Cal. Rptr. 240, 248-49, 447 P.2d 352, 360-61 (1968), is whether the action of the government involved "quasi-legislative policy-making ... sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision." 543 So.2d at 736. Kaisner readily found that under this test, "The precise manner in which a motorist is ordered to the side of the road is neither quasi-legislative nor sensitive." Id. at 737. While the application of that California test to the instant facts might arguably not as easily yield the same result, we conclude that it does yield the same result here. That is, we conclude that the precise manner in which a police chase is continued is likewise "neither quasi-legislative nor sensitive."
As appellants point out, we are not dealing with a mere decision to initiate a pursuit of a lawbreaker. Under the allegations in this case the decisions to continue the pursuit under the circumstances, as well as Corporal Rusher's particular failure to warn, exposed appellants' decedents to the danger.
The Washington test, also relied upon in Kaisner, originated in Evangelical United Brethren Church v. State, 67 Wash.2d 246, 255, 407 P.2d 440, 445 (1965) and has four parts, as follows:
First, did the act of the officers in this instance involve a basic governmental policy, program or objective? ...
Second, is the act essential to the realization of basic policy? ...
Third, did the act require basic policy evaluation or expertise? ...
Fourth, was the act lawfully authorized?
Kaisner, 543 So.2d at 737. Under this test, "If these preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious... ." Id. at 736. As to this test, the Florida Supreme Court in Kaisner observed that it had earlier pointed out in Commercial Carrier that if any one or more parts of the test could be answered in the negative, "further inquiry might be required by the court." Id. at 737.
In applying the Washington test, Kaisner gave a negative answer to each to the first three parts and an affirmative answer to the fourth. In answering the first part in the negative, Kaisner said, "The decision as to where motorists will be ordered to the side of the road at best is a secondary concern... ." Id. (emphasis added). The emphasis we have added to the word "where" in that quotation indicates the meaning we attribute to that word. That is, we conclude Kaisner meant in that regard that, while a governmental decision to enforce traffic laws or, more narrowly, to countenance officers ordering to the side of the road motorists who violate the traffic laws, is a policy matter which is immune from liability, the kind of decision involved in that case was not such a policy matter because it concerned the implementation of policy. Kaisner concluded that that implementation was of at best secondary, i.e., of not material, concern in the consideration of whether entertaining a lawsuit growing out of that decision might constitute unjustifiable interference by the courts with basic governmental policy making. Id.
Similarly in the case at hand, we conclude that no basic governmental policy making is improperly interfered with by permitting this suit which grows out of *169 how the governmental policy to enforce the traffic laws or, more narrowly, the policy to countenance the pursuit of motorists who violate the traffic laws, is implemented. We recognize that this line of reasoning in Kaisner and here may be considered to be somewhat obscure. In fact, it may be thought of as exemplifying the amorphous nature of the kind of analysis required in cases of this kind. Nonetheless, since, as noted above, the policies of the governmental entities in this case were allegedly contrary to the continuation of the pursuit  and, in fact, it is alleged that there had been an order to terminate the pursuit, this suit would clearly seem to be consistent, and not an interference, with governmental policy.
As to the second part of the Washington test, Kaisner found that the act involved was not essential to the realization of basic policy as there could be safer methods of ordering a motorist to the roadside that would both ensure the motorist's safety and meet the governmental objective of law enforcement. Id. Similarly in the case at hand, there could be safer methods of apprehending a traffic violator that would not unreasonably imperil innocent parties and would at the same time adequately meet governmental objectives.[4]
As to the third part of that test, Kaisner found that the act in question did not require basic policy evaluation or expertise, but merely involved the manner in which a basic governmental policy was being implemented. Id. In Kaisner the supreme court noted that it was not attempting "to establish a rule preventing officers from ordering motorists to the roadside" in which case it "would be entangling [itself] in matters involving basic policy... ." Id. Similarly in the context of this case, we find no threat to basic policy evaluation. This lawsuit does not, we conclude, "entangle" the courts in basic policy because, as we have said, it does not challenge appellees' authority to use police pursuits to further the governmental policy of law enforcement. That is, both Kaisner and this case involve the way a governmental policy is implemented.
As to the fourth part of that test, Kaisner stated that law enforcement officers have the authority to stop drivers for traffic violations. Id. Similarly in this case, law enforcement officers have the authority to conduct pursuits to apprehend traffic violators.
Kaisner concluded its application of the Washington test by performing the above-referenced further inquiry called for in Commercial Carrier. In so doing, Kaisner determined that, while the act of ordering motorists to the roadside in that case "involved a degree of discretion," that discretion was not of the type "that needs to be insulated from suit." Id. Kaisner reasoned:
Intervention of the courts in this case will not entangle them in fundamental questions of public policy or planning. It *170 merely will require the courts to determine if the officers should have acted in a manner more consistent with the safety of the individuals involved.
Id. at 737-38. Similarly in this case, permitting this suit to proceed under its pleadings will merely require the courts to determine if the law enforcement officers should have conducted the pursuit in a manner more consistent with the safety of innocent bystanders like appellants' decedents.
Thus, we conclude that the alleged acts of appellees in continuing the pursuit were operational, not discretionary, and were not entitled to sovereign immunity.

B. Factually Analogous Cases

As we have said, factually analogous cases involving law enforcement pursuits of lawbreakers resulting in injury or death to innocent bystanders may be interpreted as being fully supportive of or reconcilable with our conclusion that there was alleged in this case a breach of a duty of care to which the doctrine of sovereign immunity does not apply.
City of Miami v. Horne, 198 So.2d 10 (Fla. 1967) is the most difficult such case to interpret. In Horne a traffic law violator was pursued by a municipal police car at estimated speeds in excess of ninety miles per hour through the streets of Miami. A second police car joined the pursuit and a third set up a road block. The violator ran several red lights during the pursuit and, before the vehicles reached the road block, collided at an intersection with a car driven by plaintiff's wife. Id. at 11.
Resting upon the pleadings its holding that the municipality was not liable, Horne said, "It seems reasonably clear that the complaint charged that the pursuit itself constituted reckless and wanton conduct rather than that, although pursuit per se was lawful, the manner of pursuit, the conduct of the officers in otherwise discharging a necessary duty, was reckless and wanton." Id. at 12. On that basis Horne reversed the Third District Court of Appeal and directed that the trial court's summary judgment in favor of the municipality be reinstated. Id. at 14. But Horne also said, "We think the rule is that the officer should take such steps as may be necessary to apprehend the offender but, in doing so, not exceed proper and rational bounds nor act in a negligent, careless or wanton manner." Id. at 13.
Though the facts of the case at hand are similar in a number of respects to those of Horne, it is sufficiently clear from the second amended complaint here that appellants, unlike the plaintiff in Horne according to the supreme court in that case, are not pleading that simply the pursuit, i.e., the fact that the pursuit had been initiated, was wrongful. Rather, as we have said, their position is that the continuation of the pursuit and the manner in which it was continued did, borrowing from the words of Horne, "exceed proper and rational bounds," especially in light of the foregoing policies which were allegedly violated. They allege that the pursuit unreasonably continued to a point which was negligent and careless. Whether or not these allegations are valid should, we conclude, be for the trier of fact. See 57 Am.Jur.2d Municipal, County, School, and State Tort Liability § 474 (1988) ("[T]he decision whether to pursue may well be characterized as a policy or discretionary decision subject to immunity, but the manner and extent of the actual pursuit may be classified as ministerial and thus outside the general grant of immunity.") (emphasis added).
The pleadings in Horne as quoted in the opinion in that case would, on the surface, seem to have been susceptible of a construction other than that of the Florida Supreme Court. That is, they seemingly could have been construed as having alleged that the manner of the continuing pursuit in that case (over 90 m.p.h. on city streets in a well-populated area, running several red lights[5]), rather than the pursuit *171 itself, had been reckless and wanton. Under that construction the Horne holding of no governmental liability could be interpreted to apply to a case like this in which the manner of the pursuit, i.e., its continuation under the circumstances described above, was alleged to have been reckless.[6] In any event, whether allegations like those in Horne and those in this case are viewed as concerning only the fact of pursuit or also the manner of pursuit, we recognize the legitimacy of appellees' argument that the Horne result controls because of similarities between the facts pleaded in that case and those pleaded in this case. Both case involve multiple traffic signals having been disregarded during a multivehicle high speed pursuit of a traffic law violator on city streets.
Nonetheless, for at least two reasons we do not conclude that the Horne result controls. First, since the pleadings in this case do not simply allege that the pursuit, i.e., the act of initiating the pursuit, was reckless but allege a reckless manner of pursuit, we apply the distinction indicated in the Horne opinion as existing as a matter of law between an insufficient allegation concerning a mere pursuit, or initiation of a pursuit, on the one hand, and a sufficient allegation concerning the manner, or reckless continuation, of a pursuit, on the other. We follow that legal distinction derived from Horne regardless of similarities between Horne's pleaded facts and those of this case.
Second, the Horne facts are not sufficiently similar to those in this case so that the Horne result should control. The facts of the multivehicle, high speed pursuit on city streets in that case (but no more than several red lights were disregarded) are not of the same fundamentally pertinent and egregious nature as those of the multivehicle, high speed pursuit on city streets in this case (thirty-four traffic control devices were disregarded over twenty-five miles) so as to show clearly that the officers in that case had, as they are shown to have had in this case, a reasonable opportunity to terminate the pursuit after the danger of its continuation from the disregard of traffic control devices became fully apparent. That is, it does not appear to have been established in that case, as is apparent under the allegations in this case, that there was a very clearly sufficient period of time in which the pursuing officers could have been reasonably expected to have fully recognized the danger upon continued pursuit from the disregard of traffic control devices and stopped before that danger materialized in the form of a collision at an intersection with an innocent bystander. It could be concluded that about the time the lawbreaker in Horne had disregarded several traffic signals, i.e., about the time clear notice of such danger was manifested, the collision with an innocent bystander occurred.
Accordingly, the manner of the pursuit alleged in Horne was not shown to have been reckless. Thus, in contrast to this case it could have been concluded in Horne, as the supreme court did conclude, that the fundamental nature of the claim in that case was that the mere initiation, or fact, of the pursuit was reckless.
Stated more specifically, by Horne saying that the complaint in that case did not allege a reckless manner of pursuit, Horne *172 does not appear to have meant that the complaint did not allege, i.e., did not describe, the manner of pursuit; to the contrary, it appears obvious that the manner of pursuit was alleged. Horne appears to have meant in that regard only that the complaint in that case insufficiently alleged that the manner of pursuit which was alleged was reckless. The logical reason for that insufficiency was that the Horne complaint did not show that the officers in that case had had a reasonable opportunity to terminate the pursuit after the danger from its continuation became clearly apparent. Therefore, as Horne said, the allegations in that case about the pursuit amounted to no more than that the pursuit itself, i.e., the fact of the pursuit having been initiated, was reckless. That is in contrast to the allegations in this case which do show that the manner of pursuit was reckless because they show that the officers had had a reasonable opportunity to terminate the pursuit after the danger from its continuation became clearly apparent. Also, two law enforcement vehicles were following the lawbreaker in Horne, as contrasted with fourteen in this case.
Our reversal is not inconsistent with Horne's recognition that the relevant standard of care applicable to law enforcement officers in a case like this is not as strict as that applicable to others. 198 So.2d at 13. The relevant standard of care as applied to the circumstances is, of course, for the jury's consideration.
As shown above, we fully recognize the above-quoted requirement in Horne that a suit involving a law enforcement pursuit like that alleged in this case should allege that "the manner of pursuit, the conduct of the officers in otherwise discharging a necessary duty, was reckless and wanton." However, we do not conclude that Horne thereby required, as appellees seem to argue, that in order for a suit of this kind to be actionable, there must necessarily be allegations of particular operational ways in which the officers drove their cars recklessly. Indeed, it would be difficult to visualize realistically a law enforcement pursuit of a lawbreaker who would not initially stop which was not reckless in the way an officer drove his car in the ordinary sense of the word "reckless." We have in mind in that regard what might be thought of as a more common pursuit  one conducted by an officer over perhaps several blocks "recklessly" because it was at a very high speed on a city street. That is, law enforcement pursuits inherently have characteristics that could in other circumstances be characterized as reckless. If recklessness in the way in which an officer drove his car in the foregoing description of a more common pursuit was the kind of allegation meant by the above-quoted requirement of Horne, that would mean that virtually all law enforcement pursuits resulting in injury or death to innocent bystanders would be actionable, which would, of course, be contrary to the entire import of the Horne opinion.
While truly outlandish conduct of a pursuing officer more extreme than that in the more common pursuit described above could conceivably be what the above-quoted requirement in Horne referred to (and might be thought of in ordinary situations as constituting gross recklessness, carelessness, or negligence), we do not conclude that Horne required that in order to be actionable a complaint must necessarily contain such unrealistic allegations. For example, we do not conclude that such a suit must allege such things as a pursuing officer driving at a high speed without his hands on the steering wheel or at a high speed through a crowded pedestrian mall or driving with a known defective vehicle which would go out of control at a high speed. Instead, we conclude that within the scope of Horne's above-quoted requirement that a reckless manner of pursuit be alleged are allegations like those in this case that the continuation of a pursuit, i.e., the failure to stop it, may under circumstances like those alleged here make the manner of the pursuit reckless and thereby actionable. We also conclude, as indicated above, that such a continuation may cause the pursuit to have, within the meaning of other Horne language, "exceed[ed] proper and rational bounds."
*173 Moreover, Horne noted the general proposition that a municipality may be liable for the negligent acts of its police officers committed within the scope of their employment. For that proposition Horne cited Town of Mount Dora v. Bryant, 128 So.2d 4 (Fla. 2d DCA 1961). Bryant also involved a police pursuit that resulted in a collision between the pursued vehicle and a plaintiff who was an innocent bystander. Bryant reversed a summary judgment in plaintiff's favor on liability but remanded the case for trial. The opinion in that case additionally stated that the trial court had not erred in denying defendant's motion for summary judgment, saying that the issue of the negligence of the police officer was for the jury. 128 So.2d at 6.
Bryant is strong support for our reversal in this case because it required a jury trial on the issue of the negligence of a pursuing law enforcement officer and is factually similar to this case in the same pertinent way that, as explained above, this case is not sufficiently similar factually to Horne. That is, the high speed pursuit in Bryant, which covered sixteen miles, had been protracted, as it was in this case where it covered over twenty-five miles, and provided the pursuers in both cases with reasonable opportunities to terminate the pursuits after the danger of continuation became apparent. As in this case where there was no lessening of the lawbreaker's efforts to get away during the night pursuit and the danger was continually increased by his disregard of traffic signals, in Bryant there was no such lessening and the danger was continually increased during the night pursuit by the lawbreaker's intermittently turning off his headlights. In both cases the increased dangers caused or contributed to the collisions. In this case the collision occurred in an intersection while the lawbreaker was disregarding a traffic signal. In Bryant the collision occurred on the lawbreaker's wrong side of the road after his lights had been turned off (the collision occurring instantaneously upon his turning them back on). Therefore, Bryant, like this case and in contrast to Horne, involved a claim that the manner of the pursuit was reckless and negligent, not the mere fact or initiation of the pursuit.
In addition, consistent with our foregoing interpretation of Horne that in order to show a breach of duty by a pursuing officer under circumstances like those in this case there need not necessarily be allegations and proof of particular operational ways the officer drove his car recklessly, Bryant does not refer to any such allegations or proof. Furthermore, the circumstances in Bryant could be thought of as less egregious than those in this case in that not only did the pursuit in Bryant cover fewer miles but it was, in contrast to the circumstances here, in a rural area.
In the final analysis, Horne can be argued to be both against and for, or at least fully reconcilable with, our reversal of the trial court's dismissal in this case, as we have indicated above and as appellees and appellants respectively have argued on this appeal. Our conclusion is that the Horne opinion is somewhat ambiguous in the sense that no result on appeal in this case could fully square with all of the language in that opinion. We acknowledge, as indicated further above, that Horne is susceptible of an interpretation which supports the trial court's dismissal in this case. In particular in that regard, the complaint in that case, as does the complaint in this case, alleged that a number of traffic control signals had been disregarded in the continuation of a high speed pursuit on city streets of a traffic law violator who collided with an innocent bystander. We also acknowledge that the interpretation of Horne which we have adopted as to the officers in that case not having been shown to have had a very clearly sufficient time to recognize the danger requires a perception of what was, or must have been, meant by, but was not fully spelled out in, the opinion in that case. Yet, that interpretation is not only fully logical but appears to be the only reasonable explanation for the language used in that case about a reckless manner of pursuit not having been alleged. That interpretation also appears to be the only way to reconcile Horne with Bryant. As we have explained, the facts alleged in this *174 case regarding the continuation of the pursuit are substantially more egregious than those recited in Horne. The opinion in Horne does not show that there was in that case the type of clear, continued, persistent notice of danger allegedly involved in this case.
Presumably the Horne opinion, which approved a summary judgment of no liability, was deliberately made somewhat ambiguous for the purpose of not foreclosing liability without a trial in all cases involving law enforcement pursuits of lawbreakers resulting in injury or death to innocent bystanders. We conclude that this is one of those cases in which liability should not be so foreclosed, i.e., in which there are, as we have indicated, allegations to the effect that, borrowing from the words of Horne, the pursuit "exceed[ed] proper and rational bounds" and was continued "in a negligent, careless or wanton manner."
Sintros v. LaValle, 406 So.2d 483 (Fla. 5th DCA 1981), while factually sketchy, is similar to this case. Sintros cites Horne and fully supports our reversal. In Sintros, the plaintiff alleged that he was injured when his vehicle was struck by a vehicle that was being pursued by police officers. Id. at 484. He alleged that the police pursuit was negligently conducted and caused his injuries. Id. The Fifth District Court of Appeal in Sintros reversed the trial court's dismissal of the complaint and unequivocally held:
[T]he operation of a motor vehicle by a governmental employee within the scope of his governmental employment is an "operational level" activity and . .. a complaint properly alleging that such activity was negligently performed and that such negligence was the legal cause of plaintiff's injuries states a cause of action for compensatory damages against a governmental agency as against the argument of sovereign immunity.
Id. See also Trianon Park Condominium Assoc. v. City of Hialeah, 468 So.2d 912, 920 (Fla. 1985) ("The lack of a common law duty for exercising a discretionary police power function must ... be distinguished from existing common law duties of care applicable to the same officials or employees in the operation of motor vehicles ... to enforce compliance with the law.").
Two of the appellees argue that Sintros is in conflict with Rhodes v. Lamar, 490 So.2d 1061 (Fla. 5th DCA 1986), a subsequent Fifth District case involving injuries to an innocent bystander from a law enforcement pursuit of a lawbreaker. Their argument is not without foundation from portions of the Rhodes opinion. In affirming a summary judgment in favor of a municipality on the authority of Horne, Rhodes stated, "The appellant concedes the record does not disclose any negligent operation by the deputies of their patrol car, but asserts that they were negligent in continuing the high speed chase through a heavily traveled area." 490 So.2d at 1061-1062 (emphasis added). However, the facts outlined in Rhodes are sketchy in contrast to those alleged in this case. Also, Rhodes, in contrast to its foregoing statement, further stated, consistent with the distinction drawn above between the mere fact, or initiation, of a pursuit and the continuation, or manner, of a pursuit, that "[t]he decision to institute pursuit of a lawbreaker is a discretionary, planning level decision for which the Sheriff enjoyed sovereign immunity." 490 So.2d at 1062 (emphasis added). In addition, Rhodes went on to base its holding upon its further statement that "[a]ppellant's cause of action rests solely and completely on the fact of pursuit, which is a discretionary, judgmental decision by the officer protected by the doctrine of sovereign immunity." Id. at 1062 (emphasis added). Thus, Rhodes, by being unclear as to whether its holding of no liability was based upon only the fact, or institution, of the pursuit having been alleged or the continuation, or manner, of the pursuit having been alleged, appears ambiguous for present purposes.
In resolving that ambiguity we do not interpret Rhodes as having held, as one of the appellees argues, that the continuation of a law enforcement pursuit resulting in injury or death to an innocent bystander is necessarily protected by the doctrine of *175 sovereign immunity. We adopt an interpretation of Rhodes, consistent with our interpretation described above of Horne, as having held that the initiation of such a pursuit, i.e., the fact that there was a pursuit, is so immune in contrast to the allegations of the case at hand concerning the manner of the continuation of the pursuit. To resolve the Rhodes ambiguity in this way and at the same time to perceive full consistency among the various statements in that opinion, the first of the above quotations from Rhodes as to the continuation of the pursuit would have to be taken to have referred only, as it literally says, to what appellant asserted, i.e., argued, to the appellate court in that case, not necessarily what had been alleged or otherwise shown when the case was disposed of on summary judgment. That may be a strained interpretation, but Rhodes does not seem susceptible of a clear interpretation applicable to this case.
That Rhodes additionally stated, "There is no allegation nor [sic] showing here that the injury to appellant was proximately caused or contributed to by the negligent acts of the deputies in the operation of their motor vehicles," id. at 1062, should also not be taken to mean that the continuation of a police pursuit under particular circumstances cannot constitute actionable negligence against a governmental entity. The facts as described in that opinion having been sketchy, it does not appear that that case involved the kind of pursuit which the case at hand is alleged to involve. In fact, the Rhodes opinion may reflect a situation even less similar to the situation in this case than that in Horne because Rhodes is not shown to have involved a multivehicle pursuit in which multiple traffic signals were disregarded. Rhodes, accordingly, does not show that there was in that case the type of continued notice of danger allegedly involved here.
Again, in this case the cause of action rests not upon the fact of pursuit but upon the continued and persistent nature of the pursuit under circumstances which could support a finding that the pursuers had been on particular notice, different from that involved in other more common pursuits, that their persistence could and would likely cause injury to innocent bystanders. We are not disagreeing with Rhodes that a mere pursuit by a law enforcement officer of a lawbreaker resulting in injury to an innocent bystander is not actionable. It is the alleged decision in this case of the officers to continue the pursuit after notice of likely injurious consequences to innocent bystanders which is operational and therefore actionable.
In the final analysis, Rhodes, being, as we have said, ambiguous, can be argued to be both against and not inconsistent with our reversal of the trial court's dismissal in this case. To the extent Rhodes may be considered to be against our reversal it may be that the Fifth District Court of Appeal has not continued to recognize that case: as indicated below, analogous Fifth District cases which have been decided subsequent to Rhodes are fully supportive of our reversal and cite Sintros, not Rhodes.
In any event, to the extent Rhodes may be interpreted differently from our interpretation and as having held that the manner in which any law enforcement pursuit is continued is not actionable under Horne, we would disagree as we do not construe Horne that narrowly. Furthermore, to the extent both Rhodes and Horne may be interpreted to that same effect we would conclude that they have been effectively overruled by the "foreseeable zone of risk" concept announced in Kaisner.
Our conclusion that a case like this involving a pursuit by law enforcement officers should, assuming its allegations are factual, go to the jury on the issue of the negligence of the officers is further supported by the Fifth District's opinion in Putnam v. Eaton Construction Co., 535 So.2d 615 (Fla. 5th DCA 1988). In Putnam a summary judgment of no liability was reversed. That case, which involved a chase of a car thief by a citizen who was not a law enforcement officer, pointed out, citing Sintros (and not Rhodes), that if the chase had been lawful (as, of course, is that by a law enforcement officer against a lawbreaker), i.e., "even if he was attempting to make a common-law citizen's arrest, *176 he did not have the right to press the chase in a negligent or reckless manner." 535 So.2d at 617 (emphasis added). Factors to be considered by the finder of fact in determining whether or not a chase was pressed, i.e., in the context of this case, continued, in a negligent manner were recited in Putnam as being "the speed of the chase, the type of streets it covered, the density of traffic, and threats or other circumstances which put the pursued driver in fear of the pursuing driver." Id. at 617. That, as Putnam noted, factors are relevant "which put the pursued driver in fear of the pursuing driver," indicates possible relevancy in the case at hand of the number of law enforcement vehicles which joined the pursuit.
Putnam also pointed out that it was for the finder of fact to determine whether the pursuer-defendant "should have been on notice that [the fugitive] would likely take ... drastic steps to avoid apprehension... ." Id. Putnam added the observation, which might also be made in this case depending upon the proof, that "[d]eath or severe injury to other motorists or pedestrians using the chase street is, frankly, the most likely result of vehicles moving at high speed through city streets." Id. That observation may be taken to apply in effect the Kaisner "foreseeable zone of risk" concept discussed above to fact situations like that alleged in this case. Also apropos is the further statement in Putnam that "[t]o be a foreseeable consequence of a reckless chase, it is not necessary that the pursuing driver be able to foresee the exact manner in which an accident occurred. It is only necessary to show that such an injury would likely result in some manner as a consequence of the negligent act." Id. at 617-18 (emphasis in original). But in this case the manner in which the accident was alleged to have occurred  from the lawbreaker disregarding a traffic signal  was foreseeable. See also Bryant.
We do not conclude that the legal responsibilities to innocent bystanders of a pursuer of a lawbreaker for the purpose of making a citizen's arrest, as those responsibilities are spelled out in Putnam, should be substantially different from  and certainly not greater than  those of law enforcement officers who presumably are trained for pursuits.
Also supportive of our reversal is Miller v. Dept. of Highway Safety & Motor Vehicles, State of Florida, 548 So.2d 880 (Fla. 5th DCA 1989), the apparently most recent Florida appellate case in point. Miller reversed a summary judgment which had found that the doctrine of sovereign immunity protected the state from liability for injury to an innocent bystander resulting from a highway patrol pursuit of a lawbreaker who collided with the bystander. Citing, among other cases, Horne, Bryant, Trianon, Sintros, and Putnam (and not Rhodes), the Fifth District characterized as "well established" the law reflecting "police authorities' potential liability for injuries suffered by innocent parties as a result of a negligently conducted police car chase, whether the damages were actually inflicted by the pursued car or the pursuing car." Id. at 881. Also pertinent to the case before us are the following additional statements in Miller (which does not contain a factual description of the pursuit in that case):
A police officer's negligent driving during a "police chase" constitutes an operational level activity for which the governmental unit is not immune. Sintros.

Florida courts agree that the question of whether such liability exists is an issue of fact for the jury to decide ... except where there is no record evidence of lack of due care in the operation of the police vehicle.
Id. (footnote omitted).
Thus, analogous case law is consistent with our conclusion that appellants' pleadings should not have been dismissed on the basis of lack of duty or sovereign immunity.

C. The Proximate Cause Issue Is for the Jury

Finally, with regard to point (3) on appeal, we conclude that it should not be ruled at this stage that as a matter of law *177 the driving of Deady constituted the sole and proximate cause of the collision between him and appellants' decedents. Proximate cause depends upon foreseeability, foreseeability is in issue here particularly under the Kaisner "foreseeable zone of risk" concept, and foreseeability is typically a question of fact for the finder of fact. See Stahl v. Metropolitan Dade County, 438 So.2d 14, 19-22 (Fla. 3d DCA 1983).
Courts intervene on the proximate cause issue only when reasonable men could not disagree in that regard. Helman v. Seaboard Coast Line Railroad Co., 349 So.2d 1187 (Fla. 1977). See also Bennett M. Lifter, Inc. v. Varnado, 480 So.2d 1336, 1337 (Fla. 3d DCA 1985). For present purposes it cannot in our view be concluded that reasonable men would agree that it was not foreseeable to the officers that Deady's vehicle would collide with that of an innocent bystander like that of decedents. See Gibson v. Avis Rent-A-Car System, Inc., 386 So.2d 520, 522 (Fla. 1980) ("If an intervening cause is foreseeable the original negligent actor may still be held liable. The question of whether an intervening cause is foreseeable is for the trier of fact.").
In summary, we hold that appellants have stated causes of action against appellees for breaches of duty to which the sovereign immunity doctrine does not apply and that whether any such breach was the proximate cause of the claimed damages is for the jury.

III. POLICY CONSIDERATIONS AND REASONS WHY FLORIDA SUPREME COURT REVIEW APPEARS APPROPRIATE
This case involves two societal values which conflict: (1) that of encouraging motor vehicle pursuits of lawbreakers by law enforcement officers, thereby encouraging apprehensions of lawbreakers, and (2) that of discouraging injury or death to innocent bystanders resulting from motor vehicle pursuits of lawbreakers by law enforcement officers. Our decision to reverse in effect assigns to the value reflected in (2) more weight than to that in (1) under the alleged circumstances of this case. Our reversal therefore is to the effect that the protection of innocent bystanders from what may be considered under the alleged circumstances as being likely, or at least foreseeable and readily avoidable, injury or death outweighs the importance of the pursuit and possible apprehension of the lawbreaker in this case who had run a red light. This result is consistent with what has been called "the modern tendency ... against the rule of nonliability of governmental units for the acts of their policemen... ." Annotation, Liability of Governmental Unit or Its Officers for Injury to Innocent Occupant of Moving Vehicle, or for Damage to Such Vehicle, as Result of Police Chase, 4 A.L.R. 4th 865, 871 (1981).
Because it is alleged that appellees, the governmental entities who employed the officers, had each established policies restricting, discouraging or eliminating pursuits of lawbreakers by law enforcement motor vehicles, or at least the kind of pursuit alleged to have been involved here, it could be concluded that appellees have in effect agreed generally with the relative weights we have given to the above described values. In any event, it is clear from those alleged policies that appellees have been aware of the nature of the problem and have worked toward a solution.
It may be that appellees' defense of this case in effect ascribes an even higher value to society's interest in well-functioning governmental entities. Their position seems to be implicitly that the functionings of governmental entities would be improperly impeded by permitting suits like this which have the effect of asking the courts to preempt the authority of those entities in the enforcement of their laws. Their position may further be taken to be that such entities should be free to try to reduce the risk of injury to innocent bystanders under circumstances like those alleged here through the adoption of beneficial policies like those referred to above without being held financially liable therefor. But whether or not well-functioning governmental entities represent a value which is higher, we *178 have concluded, as explained above under our discussion of Kaisner, that the functionings of governmental entities would not be materially impeded by the courts permitting suits like this.
In this opinion we have undertaken not only to explain our interpretations of relevant cases under the present circumstances but also to indicate how some of those cases are susceptible of contrary interpretations and to point to differing policy considerations. We have thereby undertaken to recognize the legitimacy of appellees' legal arguments, particularly those regarding Kaisner and Horne. Those arguments essentially are that, contrary to our views expressed in this opinion, the principles contained in Kaisner are not applicable to the case at hand because that case, in contrast to this, involved governmental liability arising from injury to a person who was in the custody of law enforcement officers, and that Horne's holding of no governmental liability should be considered controlling because its recited facts are similar to those of this case.
Nonetheless, in light of the egregiousness of the circumstances alleged in this case, our conclusion basically is that if there were, on the basis of sovereign immunity and lack of duty, no potential liability here, then, as a practical matter, there probably never could be governmental liability arising out of a law enforcement pursuit of a lawbreaker resulting in the deaths of innocent bystanders. That, we believe, is not the law.
For reasons including those indicated in our analysis of the case law, this case calls for a fully binding clarification of Florida law. Also, this case hinges basically upon a determination of public policy as to which there may be reasonably differing views. Accordingly, we certify this case to the Florida Supreme Court as being of great public importance and as involving the question which may be phrased as follows:
IS THE CONTINUATION BY LAW ENFORCEMENT OFFICERS OF A HIGH SPEED VEHICULAR PURSUIT OF A TRAFFIC LAW VIOLATOR WHICH RESULTS IN DEATHS OF INNOCENT BYSTANDERS AN ACTIONABLE BREACH OF DUTY INVOLVING AN OPERATIONAL LEVEL GOVERNMENTAL FUNCTION WHICH IS NOT IMMUNE FROM LIABILITY WHEN IT IS ALLEGED THAT UNDER THE CIRCUMSTANCES THE OFFICERS SHOULD HAVE KNOWN THAT CONTINUING THE PURSUIT WOULD CREATE AN UNREASONABLY DANGEROUS HAZARD TO INNOCENT BYSTANDERS, INCLUDING THOSE WHO WERE KILLED WHEN THE TRAFFIC LAW VIOLATOR'S VEHICLE COLLIDED WITH THEIR VEHICLE?
Reversed and remanded with the direction that the second amended complaint be reinstated.
FRANK, J., concurs.
PARKER, J., concurs specially with opinion.
PARKER, Judge, Specially Concurring.
I concur with the result the majority reaches in this case; however, I do not join in the part of the majority's opinion which addresses the allegations of the complaint that Corporal Rusher had an affirmative duty to warn the decedents of the approaching vehicles.
I do not agree that Corporal Rusher was a part of the vehicle pursuit in this case. To pursue, by definition, means to follow in an effort to overtake or to capture. Webster's Third New International Dictionary 1848 (1986). A forward officer, aware of an approaching vehicle, cannot pursue that vehicle until the vehicle passes the officer. Therefore, in my opinion, the forward officer cannot be part of an existing police pursuit until the officer joins that pursuit. Also, I am not ready to say that an officer ahead of a pursuit, who is aware of the pursuit, has an affirmative duty to initiate warning the public of the possible oncoming danger. First, it would be very difficult in many situations for an officer ahead of an approaching pursuit, through radio communications, to assess the extent *179 of the danger to the public surrounding that officer. Second, the danger may never reach the area where the forward officer is stationed. Third, any attempt by Corporal Rusher to signal the public of a possible oncoming danger by way of lights, siren, and other signals on a busy highway may create a situation many times more dangerous for the public. One officer in one police vehicle does not have the ability to "clear the way" on a highway containing numerous vehicles. Common sense indicates that an officer's attempt to stop one vehicle from entering an intersection will have a domino effect of clogging traffic from other vehicles slowing down to observe the officer's action. This being human nature, such action by an officer would increase the danger to the public when a high speed vehicle reaches that area clogged with slowing vehicles.
NOTES
[1] We need not address, and have not addressed, whether under the allegations Corporal Rusher had a duty if he were not effectively a part of the pursuit.
[2] The specially concurring opinion in this case disagrees with our holding as to Corporal Rusher. In support of its position that Corporal Rusher was not a part of the pursuit, that opinion contains a dictionary definition of "pursue." Whether or not there are other, different dictionary definitions of that word which could be used to rebut that position, no reason is given, or is apparent, why any such definition should be of significance. Our reasons for concluding that Corporal Rusher was effectively a part of the pursuit have been explained. We have not purported to use that word in a technical, literal sense. In any event, he was, as we have explained, a part of the efforts to stop Deady, and, whatever those efforts are called, there should not at this pleadings stage be a ruling of no liability in that regard as a matter of law.

The remainder of the specially concurring opinion expresses concerns about whether an officer who is not a part of a pursuit and is only "an officer ahead of an approaching pursuit" and a "forward officer" has a duty to warn. In that regard that opinion does not respond to a position we have taken or relied upon. Nonetheless, because those expressed concerns are directed to an argument included in appellants' arguments and also are aimed at our holding (although not entirely accurately since under our holding Corporal Rusher was considered to be effectively a part of the pursuit), we make the following observations about them:
 The concern that in some cases a danger of which an officer is aware may never reach the area where the officer is located. Yes, that of course could occur. But that is not a significant consideration here where the danger is effectively alleged to have been impending.
 The concern that an officer forward of a pursuit should not be held to a legal duty to warn the public and clear the way for a danger which might arise from a fleeing lawbreaker. Yes, certainly that should be the general rule. But this is a situation allegedly involving a particular type of danger which affected particular persons foreseeably from the standpoint of a particular officer who could easily have warned them.
 The concern that the actions of an officer to warn motorists could clog traffic and thereby possibly contribute to the danger from a fleeing motor vehicle. Yes, that could happen. But this is not a concern under the alleged circumstances of this case in which a narrowly restricted warning to a particular vehicle next to the officer's vehicle would appear to have sufficed, such as a brief, low sound of the siren coupled with a verbal warning. Also, it may well be that there was not much traffic at the intersection at about 1:00 a.m.
 The concern that an officer in many situations may not be in a position to assess a danger sufficiently. Yes, that is of course true. But whether Corporal Rusher was in such a position in this particular situation, as is alleged, is for the trier of fact.
[3] Appellants alternatively argue that appellees Pinellas Park and Kenneth City waived sovereign immunity to the extent of the coverage provided by liability insurance they had purchased. Because we do not conclude that any appellee is entitled to sovereign immunity, we need not and do not address this argument.
[4] A proviso is contained in a Kaisner footnote which states, "The way in which government agents respond to a serious emergency is entitled to great deference, and may in fact reach a level of such urgency as to be considered discretionary and not operational." 543 So.2d at 738 n. 3. Kaisner did not involve a response to such an emergency, nor apparently did the pursuit in this case, at least at its inception. That is, the officers here, in undertaking to apprehend a traffic law violator, were apparently, as in Kaisner, not shown to have been "confronted with an emergency requiring swift action to prevent harm to others... ." Id. Whether the ensuing flight of Deady from the pursuit which culminated in the collision with appellants' decedents presented such an emergency to which the officers properly responded by continuing the pursuit, as two appellees contend, or, on the other hand, was an emergency of the officers' own improper making by virtue of their continued pursuit, as appellants contend, is for the trier of fact to decide.

That pursuing officers do not have carte blanche authority to pursue in any manner they choose, whether or not an emergency exists, is indicated in section 316.072(5)(c), Florida Statutes (1987). While section 316.072(5)(a)1 excepts "[t]he driver of an authorized emergency vehicle ... when in the pursuit of an actual or suspected violator of the law" from prior provisions of that statute requiring obedience to the traffic laws, section 316.072(5)(c) provides that
[t]he foregoing provisions shall not relieve the driver of a vehicle specified in paragraph (a) from the duty to drive with due regard for the safety of all persons.
Section 316.072(5)(c) is cited in the above-referenced Pinellas Park policy regarding pursuits of law breakers.
[5] While the opinion in Horne refers to several stop signs and red lights having been run, the complaint in that case, as quoted in that opinion, alleged that several red lights had been run. 198 So.2d at 11, 12. That discrepancy is a minor aspect because, while running red lights may be thought of as more egregious than running stop signs, the nature of the several traffic signals which were run in Horne makes no material difference to our principal interpretation of that case which we explain in the second paragraph below. We mention that aspect only to show that the facts of Horne have been for present purposes accurately recited in this opinion. The Horne holding which we are interpreting was, as we have said, based upon the allegations of the complaint.
[6] While the term "reckless" is not literally used in the allegations here which repeatedly refer to carelessness and negligence, it is apparent from the entire complaint, which includes allegations of a continued and total disregard of a clear danger, that recklessness in the commonly understood sense of that term is effectively alleged. In any event, from the fact that Horne indicated in this context that allegations of acts which are "negligent, careless or wanton" are actionable, as well as acts which are "reckless and wanton," it seems clear that allegations like those in this case of carelessness and negligence are sufficient and that literal allegations of recklessness or wantonness are not required.