604 So.2d 1222 (1992)
CITY OF PINELLAS PARK, etc., et al., Petitioners,
v.
Lawrence P. BROWN, et al., Respondents.
CITY OF KENNETH CITY, etc., Petitioner,
v.
Lawrence P. BROWN, et al., Respondents.
Everett S. RICE, Sheriff, etc., Petitioner,
v.
Lawrence P. BROWN, et al., Respondents.
Nos. 75721, 75722 and 75726.
Supreme Court of Florida.
July 23, 1992.
Rehearing Denied September 23, 1992.
*1223 C. Wade Yeakle, III of Yeakle and Watson, P.A., St. Petersburg, for the City of Pinellas Park.
James E. Thompson, George A. Vaka and Hala Mary Ayoub of Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, for the City of Kenneth City.
Howard M. Bernstein, Sr. Asst. Co. Atty., Clearwater, for Everett S. Rice, Sheriff of Pinellas County.
Steven T. Northcutt of Levine, Hirsch, Segall & Northcutt, P.A., Tampa, for respondents.
KOGAN, Justice.
We have for review Brown v. City of Pinellas Park, 557 So.2d 161 (Fla. 2d DCA 1990), which certified the following question of great public importance:
IS THE CONTINUATION BY LAW ENFORCEMENT OFFICERS OF A HIGH SPEED VEHICULAR PURSUIT OF A TRAFFIC LAW VIOLATOR WHICH RESULTS IN DEATHS OF INNOCENT BYSTANDERS AN ACTIONABLE BREACH OF DUTY INVOLVING AN OPERATIONAL LEVEL GOVERNMENTAL FUNCTION WHICH IS NOT IMMUNE FROM LIABILITY WHEN IT IS ALLEGED THAT UNDER THE CIRCUMSTANCES THE OFFICERS SHOULD HAVE KNOWN THAT CONTINUING THE PURSUIT WOULD CREATE AN UNREASONABLY DANGEROUS HAZARD TO INNOCENT BYSTANDERS, INCLUDING THOSE WHO WERE KILLED WHEN THE TRAFFIC LAW VIOLATOR'S VEHICLE COLLIDED WITH THEIR VEHICLE?
Id. at 178. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
After running a red light in Pasadena, Florida, John Deady attempted to elude a *1224 sheriff's deputy in a high-speed chase.[1] Before this chase ended on a stretch of U.S. 19, it would pass along a twenty-five-mile course in Pinellas County, through which normal urban traffic also was passing. Thirty-four separate traffic signals  at least some of which were ignored by this ill-fated caravan  were encountered along the way, thereby endangering everyone lawfully passing through those intersections. The route stretched from the suburbs of St. Petersburg, northward through the urban area surrounding Clearwater, and on beyond the fringes of Dunedin. This is part of the densely populated Tampa-St. Petersburg urban area. See Brown, 557 So.2d at 163-64.
As the chase continued, the sheriff's deputy was joined by at least fourteen and as many as twenty separate police or sheriff's vehicles, each of which was pursuing Deady at speeds that varied between eighty and 120 miles per hour. Although the chase was begun by a Pinellas sheriff's deputy, officers from Kenneth City and the City of Pinellas Park also joined. However, most of the officers involved were from the sheriff's department. Id.
At some point, the Pinellas County Sheriff's Department ordered its officers to discontinue the chase. For unknown or unstated reasons, this order was not obeyed.[2]Id. at 164.
By this time, the caravan was approaching the intersection of U.S. 19 and State Road 584 at very high speeds. At this intersection, Sheriff's Corporal Daniel Rusher was waiting in the turn lane, ready to move onto the highway Deady and the caravan were traveling. In the through-lane immediately next to Rusher was a vehicle occupied by two sisters, Susan and Judith Brown. Rusher made no attempt to block the intersection or to prevent the Browns from proceeding into the intersection. Rather, he was preparing to become part of the caravan. Id.
When the light turned green, Rusher moved his vehicle onto U.S. 19 so he could wait for Deady to pass and join the chase. At the same time, the vehicle containing the Brown sisters moved forward into the intersection to pass through it. Deady's vehicle illegally entered the intersection at this precise moment and struck the Browns' vehicle at ninety miles per hour. Deady and Susan Brown died instantly, and Judith Brown died three days later. Id.
According to the second amended complaint, the Pinellas Sheriff's Department at the times in question maintained a written policy, contained in General Order A-9, that required the discontinuance of certain "caravan-type" pursuits. This policy applied, says the complaint, whenever the area's citizenry was being endangered by hard pursuit, especially if the pursuit was prompted by a traffic violation. Thus, the complaint alleges that deputies directly violated this policy based on the facts at hand. The complaint alleges that this policy was further violated when the deputies disregarded the order to cease pursuit that had been given them.[3]Id. at 167.
In addition, the City of Pinellas Park also is alleged to have maintained a written policy on this question, contained in General Order Number 45, at the times in question. The complaint states that this policy required the termination of pursuit after consideration of a variety of factors. These are: (a) the identity of the fleeing individual has been ascertained, e.g., through a license-plate check; (b) the time of day and the amount of traffic was such that pursuit of the fleeing vehicle was dangerous; (c) the fleeing vehicle was clearly *1225 outdistancing the pursuit vehicles; (d) the seriousness of the crime was such that it would not warrant the risk to innocent bystanders, the officer, or the occupants of the fleeing vehicle; or (e) the number of vehicles involved in the pursuit had become too great. The complaint alleges that, based on this policy, pursuit should have been discontinued; and the officers therefore violated the written policy.[4]Id.
Likewise, the complaint alleges that the Kenneth City Police Department at the relevant times maintained an oral policy prohibiting participation in high-speed chases by its officers. This policy also was violated, says the complaint.[5]Id.
The issues before us today are (a) whether the police owed a legal duty to the Brown sisters, (b) whether the activities of the police officers described above were shielded from all liability by the doctrine of sovereign immunity in spite of any duty owed the Browns, and (c) whether there is a sufficient allegation of proximate causation to create a jury question in this instance.

Duty
In Kaisner v. Kolb, 543 So.2d 732, 735 (Fla. 1989), this Court held that
[w]here a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.
Petitioners argue that Kaisner should be factually distinguished and that the present case is controlled by City of Miami v. Horne, 198 So.2d 10 (Fla. 1967). We cannot agree.
While the facts of Kaisner indeed differ from those at hand, it is clear from the plain language of the Kaisner opinion that it was describing the general manner in which a duty of care arises under Florida law. We have so indicated in a recent opinion that directly relied upon Kaisner in making the following observation:
[A]s the risk grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken.
The statute books and case law, in other words, are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care. Rather, each defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result. This requirement of reasonable, general foresight is the core of the duty element.
McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla. 1992) (citation omitted). In the present case, we think it manifest that a high-speed chase involving a large number of vehicles on a public thoroughfare is likely to result in injury to a foreseeable victim, and that the discontinuance of this chase by police is likely to diminish the risk. In other words, some substantial portion of the risk is being created by the police themselves, notwithstanding any contributory negligence of the person being chased. Accordingly, we believe the law must recognize a duty in this context even though the accident did not involve a police vehicle.
We find nothing in Horne supporting a contrary conclusion. As the district court below correctly noted, Horne expressly stands for the proposition that hot pursuit by police officers does not always give rise to liability, but sometimes can. In Horne we stated:
It seems reasonably clear that the complaint [in Horne] charged that the pursuit itself constituted reckless and wanton conduct rather than that, although pursuit per se was lawful, the manner of pursuit, the conduct of the officers in otherwise discharging a necessary duty, was reckless and wanton.
Horne, 198 So.2d at 12. The issue addressed in Horne, in other words, was whether a valid complaint is stated if the plaintiff alleges only that hot pursuit is per *1226 se negligence. Rejecting this claim, we simply held that a plaintiff must allege that the police engaged in hot pursuit in a negligent or wanton manner.[6]Id. at 13. We stated:
We think the rule is that the officer should take such steps as may be necessary to apprehend the offender but, in doing so, not exceed proper and rational bounds nor act in a negligent, careless or wanton manner.

Id. (emphasis added). Accord Brown, 557 So.2d at 170 (quoting same material). Here, "rational bounds" clearly were exceeded under the facts alleged.
We emphasize, however, that even in the absence of the hot-pursuit policies quoted above or the order to cease pursuit, we believe the chase described in the Second Amended Complaint clearly would give rise to a duty under the principles described in Kaisner. In no sense should this opinion be read as penalizing to any degree only those law enforcement agencies that have adopted hot-pursuit policies. The acts alleged here describe a situation in which motorists in Pinellas County were placed in deadly peril by as many as twenty police vehicles attempting to chase down a single man who had run a red light. On its face, this allegation alone definitely makes out a case for a duty owed to all persons who might encounter the police caravan that was chasing Deady. Such a duty would have existed whether or not any hot-pursuit policy existed and whether or not the police had been ordered to cease their pursuit.

Sovereign Immunity
The next question is whether the police were immune from liability notwithstanding the duty placed upon them by the law. Again, our most recent pronouncement on this issue is contained in Kaisner, where we noted that sovereign immunity does not shield acts that are "operational" in nature but only those that are "discretionary." As to this question, we held that an act is operational if it
is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented.
Id. at 737 (emphasis added). Governmental acts are "discretionary" and immune, on the other hand, if they involve
an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning.
Id.
Based on the plain language of Kaisner, we cannot accept petitioners' argument in favor of sovereign immunity in this case. We utterly fail to see how the events alleged in this complaint are anything but "operational." Taking the allegations in the complaint as true,[7] we are faced with a situation in which officers engaged in flagrantly dangerous conduct that went far beyond what was necessary to vindicate the laws of Florida. Moreover, this conduct cannot honestly be characterized either as "policy" or "planning," because it self-evidently was contrary to both. See Department of Transportation v. Neilson, 419 So.2d 1071, 1077-78 (Fla. 1982). In fact, the plaintiffs have alleged that each of the police agencies had adopted a policy to the contrary. Accordingly, the actions of the police in this instance are not entitled to sovereign immunity.
We agree that the actual execution of a hot-pursuit policy is entitled to a high degree of judicial deference consistent with reason and public safety. Kaisner specifically noted that special deference is given to pressing emergencies, and that certain *1227 police actions may involve a level of such urgency as to be considered discretionary and not operational. Kaisner, 543 So.2d at 738 n. 3. However, this does not mean that state agents can escape liability if they themselves have created or substantially contributed to the emergency through their own negligent acts or failure to adhere to reasonable standards of public safety.
To fall within the Kaisner exception, the serious emergency must be one thrust upon the police by lawbreakers or other external forces, that requires them to choose between different risks posed to the public.[8] In other words, no matter what decision police officers make, someone or some group will be put at risk; and officers thus are left no option but to choose between two different evils. It is this choice between risks that is entitled to the protection of sovereign immunity in appropriate cases, because it involves what essentially is a discretionary act of executive decision-making. Id. at 737 (exercises of executive power are sovereignly immune).
Nevertheless, in the absence of such an emergency, the method chosen for engaging in hot pursuit will remain an operational function that is not immune from liability if accomplished in a manner contrary to reason and public safety. As we stated in Kaisner, when government agents create a zone of risk through operational functions, then the governmental unit will not be shielded by sovereign immunity. Kaisner, 543 So.2d at 735.
Here, the complaint alleges an enormous overreaction by sheriff's and police officers  one reminiscent of the most violent, daredevil films that Hollywood stunt men have produced. Solely because a man ran a red light, suddenly the innocent citizens of Pinellas County were subjected to a threatening stream of publicly-owned vehicles hurtling pell-mell, at breakneck speed, down a busy roadway in one of Florida's most densely populated urban areas. This caravan stormed through red lights for some twenty-five miles, gathering more and more police vehicles as it sped along. By the time the tragic chase ended, between fourteen and twenty police vehicles were included, only magnifying the risk to Pinellas County's innocent and unsuspecting residents. The reasons for these actions can only be dubious. Were there no more reasonable means of vindicating Florida's law against running a red light than this?
Surely there is only one answer to this question. The police simply could have taken the violator's license-plate number together with a description of the car and driver, and then stopped the pursuit. Later, the violator could be located in some less dangerous setting, arrested, and brought to justice. And even if he continued to elude police, surely everyone must agree that this result is far better than the deaths of innocent persons. In the balance, the desire to bring Deady to justice for running a red light is far less important than the lives of the Brown sisters.
We do not suggest, however, that the police must allow every lawbreaker to escape merely because a hot pursuit is occurring. Deference will be shown to the reasonable decisions of law officers to maintain pursuit of certain offenders who are reasonably thought to be violent or to pose a danger to the public at large. What is required is for police to use reasonable means in light of the nature of the offense and threats to safety involved. For example, a high-speed chase is likely to be justifiable if its object is a gang of armed and violent felons who probably will harm others. As we have stated elsewhere, deference will be shown to police conduct when *1228 officers must choose between two different risks that both will adversely affect public safety.

Proximate Causation
The remaining issue is whether a jury question exists as to proximate causation. We conclude it does. In McCain, we recently stated:
[H]arm is "proximate" in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question... . [I]t is immaterial that the defendant could not foresee the precise manner in which the injury occurred or its exact extent. In such instances, the true extent of liability would remain questions for the jury to decide.
McCain, 593 So.2d at 503 (citations omitted). A jury question does not exist, on the other hand, where
"after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm."
Id. at 504 (quoting Restatement (Second) of Torts § 435(2) (1965). Where reasonable persons may differ on this question, however, proximate causation remains an issue for the jury to resolve. Id.
Based on McCain, we believe it clear that a jury question exists in the present case as to proximate causation. Human experience and prudent foresight strongly suggest that serious bodily injury is likely to result when a stream of between fourteen and twenty vehicles are moving down an urban thoroughfare, in disregard of traffic lights, at speeds of up to 120 miles per hour. This conclusion is not undermined by the fact that Deady's vehicle, not one of the police cars, actually was engaged in the collision that killed the Browns. Experience and foresight support the conclusion that Deady engaged in such reckless conduct primarily because he was being chased by police, and that this misconduct would have ceased had the police discontinued the pursuit. There is nothing extraordinary in this conclusion. Accordingly, the issue may not be taken from the finder of fact.
For the foregoing reasons, the opinion under review is approved, and this cause is remanded to the trial court for further proceedings consistent with this opinion.
It is so ordered.
BARKETT, C.J., and SHAW, J., concur.
GRIMES, J., concurs with an opinion.
OVERTON, J., dissents with an opinion, in which McDONALD, J., concurs.
McDONALD, J., dissents with an opinion.
HARDING, J., dissents with an opinion, in which McDONALD, J., concurs.
GRIMES, Justice, concurring.
This is a close case because it involves competing public policy considerations. On the alleged facts, I am inclined toward Justice Kogan's position. However, it may well be that the cities of Pinellas Park and Kenneth City should ultimately be dismissed from the suit upon motion for summary judgment or motion for directed verdict if the evidence develops that their police departments did nothing more than follow the lead of the Pinellas County deputies.
OVERTON, Justice, dissenting.
I dissent. While a clear, definitive policy in regard to car chases needs to be established by the executive and legislative branches of our government, the majority opinion goes much too far and effectively places that policy decision solely in the judicial branch. The majority effectively makes the taxpayers of the state the insurer for injuries caused by a lawbreaker's attempt to avoid arrest. That policy also places law enforcement in a straitjacket that, in my view, will result in more harm than good.
The majority relies on hindsight in determining whether there should be liability, finding that, had the law enforcement officers involved broken off their pursuit, the *1229 fatal collision would not have resulted. Inherent in this assumption is the majority's belief that the fleeing driver would have ceased his reckless driving once the police stopped their attempt to apprehend him. The decisions made on the street by police officers are not easy ones, and hindsight is never available until it is too late. As a result of this decision, an officer must terminate the pursuit of a vehicle that is observed to be driven recklessly, refuses to stop, and increases its speed in an effort to avoid arrest. Because of concern of liability, the decision will preclude officers from preventing potentially fatal accidents by stopping a reckless or drunk driver who initially seeks to avoid arrest. Furthermore, the majority opinion apparently adopts the policy that law enforcement should not try to prevent injuries caused by reckless drivers but, instead, arrest the driver the next day. Waiting until the next day, needless to say, will create the problem of proving the identity of the driver and prevent the driver's arrest for driving while under the influence of alcohol.
In Armstrong v. Mudd, 655 F. Supp. 853 (D.C.Ill. 1987), aff'd sub nom. Marine Bank v. Hendrickson, 843 F.2d 500 (7th Cir.), cert. denied, 488 U.S. 822, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988), the Illinois court, in denying a similar claim arising from a nine-mile chase through the City of Springfield, quoted with approval State ex rel. Poulos v. Fidelity & Casualty Co., 263 F. Supp. 88, 90-91 (S.D.W. Va. 1967), where that court stated:
We must not forget that the primary duty was upon the pursued to stop... . It is hardly necessary to point out the overriding public policy of apprehending criminals as rapidly as possible, thus eliminating continued criminal acts, as a factor outweighing the undesirable consequences of holding an officer liable for the damages sustained by a third party... .
We are not prepared to hold an officer liable for damages inflicted by the driver of a ... vehicle whom he was lawfully attempting to apprehend for the fortuitous reason only that the criminal drove through an urban area. To do so would open the door for every desperado to seek sanctuary in the congested confines of our municipalities, serene in the knowledge that an officer would not likely give chase for fear of being liable for the pursued's recklessness.
Armstrong, 655 F. Supp. at 859. I agree with the Illinois court's view.
Public policy necessitates that law enforcement officers pursue fleeing offenders. The majority opinion requiring the termination of pursuit is based partly on the false premise that a fleeing offender will immediately cease his or her reckless behavior after the pursuit ceases. I find that is a naive view and sends the wrong message. It will encourage offenders to attempt escapes. In my view, this message will lead to more attempts to flee and, consequently, will put more innocent bystanders at risk.
Even assuming that this Court should set this policy, the only justiciable issue under the facts of this case relates to the conduct of the Pinellas County sheriff's department in this incident. I find no justification for allowing this action to proceed against the City of Pinellas Park and the City of Kenneth City. This incident began in the Pinellas County Sheriff's jurisdiction when a deputy sheriff sought to stop the vehicle in question, and ended in the sheriff's jurisdiction with another deputy sheriff's car being involved at the scene of the fatal accident. The only asserted wrongdoing of the Pinellas Park and Kenneth City police is that they tried to stop the offender from making a cannonball run through their jurisdictions and that they supported the Pinellas County sheriffs in their pursuit of the vehicle. The effect of the majority's holding is that participating in a high speed case is negligence per se. In my view, more must be alleged to justify holding the taxpayers of these two cities to be the insurers of this offender.
Further, I am unable to understand why a governmental entity that has a written policy on high-speed pursuits is penalized for violation of that policy by allowing the violation as a basis of negligence, while a governmental entity that has no such policy *1230 is not subject to such a negligence claim. The majority decision in this regard places governmental entities that have adopted these types of policies at a disadvantage over those entities that have not adopted such in-house regulations.
The majority's reasoning is also flawed in basing its decision on Kaisner v. Kolb, 543 So.2d 732 (Fla. 1989). I find that this case should be controlled by our decision in City of Miami v. Horne, 198 So.2d 10 (Fla. 1967), in which we rejected an almost identical claim. In that case, a motorist was stopped by a police officer for violating a thirty-mile-per-hour speed limit. When he was unable to produce his driver's license, the driver left the police car, rushed to his own automobile, and left the scene at high speed. The officer pursued the offender, using his red light and siren. The officer followed from a distance of a block or more, slowing down for stop lights while the offender went through them in total disregard of other traffic. After another officer joined the pursuit, the offender drove through several stop signs and red lights at speeds as high as ninety-five miles per hour. The pursuit ended when the offender collided with Mrs. Horne. The police officers were approximately one block behind the fleeing driver at the time of the accident. The complaint in Horne alleged that the pursuit itself constituted reckless and wanton conduct. No recovery was allowed.
In upholding the summary judgment in Horne, this Court explained that, where no allegations of lack of due care in the operation of the police vehicles had been made, there was no governmental liability for the officers' carrying out their duty. We further stated:
[T]he officer should take such steps as may be necessary to apprehend the offender but, in doing so, not exceed proper and rational bounds nor act in a negligent, careless or wanton manner.
... .
The rule governing the conduct of police in pursuit of an escaping offender is that he must operate his car with due care and, in doing so, he is not responsible for the acts of the offender. Although pursuit may contribute to the reckless driving of the pursued, the officer is not obliged to allow him to escape.

Horne, 198 So.2d at 13 (emphasis added).
Our Horne decision was not receded from in our decision in Kaisner, relied on by the majority. Kaisner presented an entirely different factual situation from the one at hand. In Kaisner, the defendant was stopped for an expired inspection sticker. The police cruiser stopped one vehicle length behind Kaisner's vehicle. Kaisner left his vehicle and walked between the two vehicles. At this time, one of the police officers told him not to come any closer. After a few minutes, one officer left the cruiser and Kaisner again began moving toward the police cruiser. The police cruiser was unexpectedly hit from behind by another automobile and was propelled forward into Kaisner's vehicle. Both Kaisner and the officer were struck by the police cruiser.
First, Kaisner did not involve the pursuit of a fleeing vehicle. More importantly, in Kaisner we distinguished Horne by noting that Kaisner had been placed in custody and, consequently, was owed a common law duty of care. The duty of care exercised by a law enforcement agency when it has a person in custody is different from the duty of care owed by a law enforcement officer to the public at large when attempting to arrest a lawbreaker. The public policy decision made by this Court in Horne is not unusual. See Kelly v. City of Tulsa, 791 P.2d 826 (Okla. App. 1990); Hooper v. City of Chula Vista, 212 Cal. App.3d 442, 260 Cal. Rptr. 495 (1989); Bickel v. City of Downey, 193 Cal. App.3d 424, 238 Cal. Rptr. 351 (1987); Thornton v. Shore, 233 Kan. 737, 666 P.2d 655 (1983); Colby v. Boyden, 241 Va. 125, 400 S.E.2d 184 (1991); DeWald v. State, 719 P.2d 643 (Wyo. 1986).
In my view, police pursuit of fleeing violators is a matter of public policy that should be established by the legislative and executive branches. The benefit of apprehending fleeing individuals and the risks inherently involved in pursuit of lawbreakers *1231 are public policy matters that initially should be made by the executive and legislative branches of government.
In conclusion, police vehicles must be driven with ordinary care, and government is responsible under the present law for damages caused by the negligent use of police vehicles. The majority's decision takes government responsibility a step further by making the governmental entity pay for the damages caused by a criminal offender trying to avoid apprehension. The decision improperly restricts law enforcement and sends the wrong message to criminal offenders and reckless drivers. The message encourages those individuals to flee from the police rather than accepting apprehension. At the very least, I would affirm the summary judgment as to the City of Pinellas Park and the City of Kenneth City because there are no allegations of any specific conduct of their officers that proximately caused the accident. Merely joining in the chase should not make the officers and the cities liable.
McDONALD, J., concurs.
McDONALD, Justice, dissenting.
I cannot embrace the concept that a law enforcement agency can be held liable for injuries caused by the negligent operator of another's vehicle because that negligent driver is being pursued by the police.[9] The majority holding places an unreasonable risk of liability upon law enforcement agencies while performing their duties. It allows the judicial branch of government to second guess whether the decision to pursue a criminal suspect is proper and whether the methods used in that pursuit were reasonable. It also puts at risk a second cooperating law enforcement entity which responds to a request for help from the first.[10]
I read City of Miami v. Horne, 198 So.2d 10 (Fla. 1967), differently from the majority. I conclude that this Court, while recognizing liability for injuries caused by the vehicles of the police, rejected the premise of liability now being adopted.
Accepting the premise that a cause of action exists, I assume that the plaintiff will have to satisfy the jury that the negligent conduct of the driver causing the collision was caused by the pursuit of the police. Failing in that, there is no causal connection between the activity of the police and the injury of the plaintiff.
HARDING, Justice, dissenting.
I dissent. An imaginative author would have a difficult time dreaming up a more bizarre and tragic scenario of events than those revealed by the record in this case. The facts make the call to change what I believe to be an appropriate principle of law most appealing.
Egregious though the facts may be, I would continue to adhere to this Court's holding in City of Miami v. Horne, 198 So.2d 10, 13 (Fla. 1967) (footnote omitted), wherein we stated:
The rule governing the conduct of police in pursuit of an escaping offender is that he must operate his car with due care and, in doing so, he is not responsible for the acts of the offender. Although pursuit may contribute to the reckless driving of the pursued, the officer is not obliged to allow him to escape.
The majority opinion places an unwarranted chilling effect on law enforcement. It draws a line too obscure for an officer to clearly know whether to pursue or to cease pursuit. While I grieve that two precious lives have been needlessly taken from their loved ones, I do not agree that the Respondents can seek compensation from the Petitioners in this case because the police are not responsible for the acts of the escaping offender.
McDONALD, J., concurs.
NOTES
[1] For purposes of deciding whether the complaint will be dismissed, we must treat all allegations in the complaint as true, without so holding. The recitation of the facts here thus comes entirely from the Second Amended Complaint. In the paragraphs immediately below, we have cited both to the Second Amended Complaint and the related portion of the opinion below.
[2] The Second Amended Complaint alleges that "an order to terminate the pursuit had been given by the supervisor which was disregarded all in contravention of General Order A-9 applicable to the PINELLAS COUNTY SHERIFF'S DEPARTMENT." Second Amended Complaint, at 8.
[3] Second Amended Complaint, at 8.
[4] Second Amended Complaint, at 8.
[5] Second Amended Complaint, at 8.
[6] The plaintiffs here clearly met this standard. They allege inter alia:

The conduct of each chase participant initiating and maintaining the high speed chase under the circumstances described deviated from reasonable and excepted [sic] standards of care of law enforcement agencies.
Second Amended Complaint, at 9.
[7] Once again, we are concerned here only with whether the facts as alleged state a valid complaint that should be tried in court. The truth of these assertions would be gauged by the factfinder at trial.
[8] We emphasize that nothing in this opinion is intended to revisit or limit the discretionary authority of police recognized in Everton v. Willard, 468 So.2d 936 (Fla. 1985). The concern raised by Everton  alleged failure of police to arrest a dangerous person when given the opportunity  is quite different from the matters at issue here. Moreover, we find that police in the present case would have incurred no liability had they honored their departmental policies and discontinued pursuit of Deady, even if Deady later injured someone with his automobile or otherwise. See id. at 938. What the police may not do is themselves needlessly exacerbate the danger to the public. Any danger a suspect poses to the public solely on his or her own cannot be imputed to the police who earlier have failed to make an arrest. Id.
[9] I recognize that many jurisdictions agree with the conclusion reached by the majority.
[10] Must these first determine that the pursued is a dangerous felon before joining in the chase?