Angela SMITH, Plaintiff,

v.

CITY OF PLANTATION, and Joseph Alu, individually, Defendants.

Angela SMITH, as the Personal Representative of the Estate of Hideko Smith and Angela Smith, as the Personal Representative of Anne Marie Smith, Plaintiff,

v.

CITY OF PLANTATION, and Joseph Alu, individually, Defendants.

Nos. 97–6878–CIV, 97–6879–CIV.

United States District Court, S.D. Florida.

Aug. 11, 1998.

Arthur W. Tifford, Arthur Tifford, P.A., Miami, FL, Lawrence R. Metsch, Metsch & Metsch, P.A., Miami, FL, for Plaintiff. E. Bruce Johnson, Christine M. Duignan, Johnson, Anselmo, Murdoch, Burke & George, P.A., Fort Lauderdale, FL, for defendant City of Plantation.

Oscar E. Marrero, O'Connor & Meyers, Coral Gables, FL, for defendant Joseph Alu.

### ORDER

GRAHAM, District Judge.

**THIS CAUSE** comes before the Court upon (1) Defendants', CITY OF PLANTATION (the "City") and JOSEPH ALU ("Officer Alu"), Motions to Dismiss and/or Alternative Motions for Summary Judgment, both filed on March 9, 1998, for Plaintiff's, ANGELA SMITH ("Smith"), Second Amended Complaint; and (2) Defendants', the City and Officer Alu, Motions for Summary Judgment, filed on February 23, 1998, and March 9, 1998, respectively, for Plaintiff's, ANGELA SMITH as the personal representative of the Estates of HIDEKO SMITH and ANNE MARIE SMITH, Amended Complaint.

### I. BACKGROUND

On July 25, 1995, Smith requested police assistance after her former boyfriend, Steve Joseph ("Joseph"), forcibly entered her house with a machete, gasoline, and a lighter, threatening to kill Smith, her three daughters (ages eleven, fourteen, and fifteen), and himself.[1] Smith contacted the police by pressing the panic button to activate her silent home alarm system.

Officer Alu visited the house twice on the morning of July 25, in response to calls received from Smith's security company. At 11:13 am, the security company first contacted the 911 operator to send police assistance to Smith's home. The City's police dispatcher dispatched Officer Alu to investigate Smith's residence at 11:15 am. Officer Alu promptly arrived at Smith's house, circled the home, and had the dispatcher call Smith, who did not answer the phone. Officer Alu was unaware that Joseph was holding Smith's daughters hostage inside the home. Officer Alu requested the police department to run a check on the tags of the automobiles parked in Smith's driveway and wrote an alarm notice. He then left the premises, after finding no visible signs of criminal activity.

1. From October 1990 through September 1994, Steve Joseph lived with Smith and her three daughters as part of their family. Following a car accident in which he sustained head injuries, Joseph became depressed and required psychiatric treatment. Around September 1994, Joseph was arrested for molesting all three of Smith's daughters. The girls eventually retracted their claims, and the charges against Joseph were dropped. After spending 30 days in jail, Joseph became more severely depressed than ever. He told Smith that being in jail "broke him down." Three weeks prior to this tragic incident, Joseph attempted suicide. Nonetheless, Smith continued to maintain contacts with Joseph, by telephone and in person. The night before this tragic incident, Smith took a television set over to Joseph's apartment because his set was broken. While there, she agreed to take him to a doctor's appointment the next day. The next day, July 25, Joseph called Smith and pleaded with her to allow him to come to her home. Smith refused his request. After their conversation, Smith sensed that he needed "special attention," so she called Joseph's primary care physician and his psychologists. She did not call the police. That same morning, Joseph showed up at her home, brandishing a machete and a can of gasoline. He told her that he was lonely and that "this was going to be the day that [they] were going to all be together."

At 11:41 am, the security company contacted the 911 operator again, stating, "I just called her to follow-up ... Somebody is in that house with her. She needs you back out there." Trans. of Dispatch Communication, p. 5. At 11:43 am, Officer Alu returned to Smith's residence and, at 11:46 am, the 911 operator again telephoned Smith. Despite the 911 operator's persistent questioning, Smith did not reveal to the police the conditions in her home. The operator then asked Smith to come outside with a cordless telephone in order to show the police that she was alright. The second conversation began as follows:

**911:** Hi. This is Plantation Police Department. Is everything okay there?

**SMITH:** Yes, Officer, everything is okay.

**911:** Okay. What was the problem? The alarm company said that you said somebody was in there with you.

**SMITH:** Um, no. I think she must have misunderstood. Everything's okay.

**911:** Okay. Well, I have a couple of officers there. Can you go outside and meet with them?

**SMITH:** If they're outside—

**911:** Yes, they—

**SMITH:**—I'll meet with them.

**911:** Okay. What are you—

**SMITH:** Do you want me to go outside and tell them everything's okay?

**911:** Okay, yeah. Well, like I said, the officers are there and they're under the impression that something's a problem in there. There's nobody there with you?

**SMITH:** No.

**911:** Are—are you sure?

**SMITH:** Yes.

**911:** Okay. You sound a little distressed. 'Cause the officers are there and they're ready to help you if anything's —

**SMITH:** I understand that. Everything's okay.

*Id.* at 9–10.

At 11:49:50 am, Smith walked out her front door and declared into the telephone, "the kids got to get out ... the kids got to get out." *Id.* at 13. She told Officer Alu that her former boyfriend was going to kill every-one in her home and that he had gasoline and a machete. At that point, 11:50:10 am, Officer Alu exclaimed to the dispatcher:

Get me some more units here now. I need some around the back. We got a guy inside with gasoline threatening to kill the kids ... He's got a knife, gasoline. He's threatening to blow up the house.

*Id.* at 13–14.

After one of Smith's daughters came running out of the house screaming, Officer Alu, along with Officers O'Hara and Massey, entered the residence to retrieve the other children. After searching the house, the officers found the bedroom where Joseph was holding the children hostage. Officer Massey recalls smelling gasoline as they walked through the home. Officer Alu recalls that Joseph splashed a substance on the officers. Within seconds, at 11:51:30 am, there was an explosion. The door to the bedroom immediately shut after the explosion. Officers Alu and O'Hara, Joseph, and the two children were all trapped in the fire. Officer Massey was thrown to the floor in the hallway outside the bedroom.

Officer Massey eventually opened the bedroom door and pulled Officer Alu out of the room by his shirt. She then went back to the room and pulled out Officer O'Hara. Officer Massey returned to the room with a water hose to rescue the others, but could not reach the children due to the smoke. Both Officers Alu and O'Hara were severely burned. Officer Massey suffered injuries from smoke inhalation.

Smith, who remained outside the house, alleges that Officer Alu caused the explosion with his firearm. She claims that she heard a gunshot prior to the explosion. However, Officer Alu has testified that while in the bedroom, prior to the blast, his gun was pointed towards the ground. Officer Massey testified that she did not hear gunshots until after the explosion. The testimonies of Officers Alu and Massey reveal that, prior to the explosion, Officer O'Hara said, "don't do that." Officer Alu has testified that Officer O'Hara was speaking to Joseph, but that despite O'Hara's warning, Joseph ignited the gasoline, causing the explosion.

## II. DISCUSSION

This case involves two consolidated cases brought against the City and Officer Alu. The first case was brought by Smith in her personal capacity, seeking compensatory damages for the destruction of her property in the fire that occurred on July 25, 1995. The second case was brought by Smith as the personal representative of the estates of her deceased daughters, Hideko and Anne Marie Smith, seeking both compensatory and punitive damage for the destruction of her property in the fire, as well as for wrongful death.

In the first case, 97–6878–CIV–GRAHAM ("SMITH I"), Count I of Smith's Second Amended Complaint seeks damages against both Defendants under Florida negligence law. Count II of Smith's Second Amended Complaint seeks damages against the City for violating her Fourteenth Amendment right "to remain free from the deprivation or destruction of her property without due process of law." SMITH I, Second Amended Complaint, ¶ 15.

In the second case, 97–6879–CIV–GRAHAM ("SMITH II"), Count I of Smith's Amended Complaint seeks compensatory and punitive damages against both Defendants under the Florida Wrongful Death Act. In Count II of SMITH II, the allegations are identical to those in Count II of SMITH I.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when the evidence in the record establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of production. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). When the moving party has met this burden by offering sufficient evidence to support the motion, the party opposing must then respond with affidavits or other evidence that establishes the existence of a genuine issue of material fact. *Adickes,* 398 U.S. at 160, 90 S.Ct. 1598.

In making this determination, the Court must decide which issues are material. The Supreme Court has stated that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court must also determine whether the dispute about a material fact is indeed genuine. In other words, is the "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Id.; Marine Coatings of Alabama, Inc. v. United States,* 932 F.2d 1370, 1375 (11th Cir.1991). If the evidence is merely colorable or not significantly probative, summary judgment may be granted. *Id.; Spence v. Zimmerman,* 873 F.2d 256, 257 (11th Cir.1989) (holding that non-movant for summary judgment need not be given the benefit of every inference, but only of every reasonable inference).

Finally, a plaintiff cannot defeat a motion for summary judgment by resting on the conclusory allegations in the pleadings. Fed. R.Civ.P. 56(e); *Anderson ·v. Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. at 2510. Nor will a summary judgment motion be defeated merely on the basis of a "metaphysical doubt" about the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "or on the basis of conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2nd Cir.1991), *cert. den.,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). This is especially true for those issues on which the non-moving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### IV. 42 U.S.C. § 1983 CLAIM AGAINST THE CITY

42 U.S.C. § 1983 creates a private cause of action against "any person" who, under color of state law, deprives another of "any rights privileges or immunities secured by the Constitution and laws [of the United States]." It

is well-settled that a municipality is among the "persons" subject to suit under § 1983. 42 U.S.C. § 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ Section 1983 provides "a method for vindicating federal rights elsewhere conferred" and is not itself a source of rights. *Skinner v. City of Miami,* 62 F.3d 344, 347 (11th Cir.1995) (quoting *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Therefore, where, as here, a § 1983 claim is brought against a municipality, the Court must distinguish between two issues: (1) whether the plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation. *Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *see Wyke v. Polk County School Board,* 129 F.3d 560, 568–69 (11th Cir.1997) (holding that, in a § 1983 case against a municipality, a court must find a violation of a constitutional right prior to finding municipal liability); *Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir. 1996); *Skinner,* 62 F.3d at 348.

### A. Constitutional Violation: Substantive Due Process Right

■ Count II of SMITH I and Count II of SMITH II are claims alleging civil rights violations under § 1983. In SMITH I, Smith alleged that the City violated her substantive right "to remain free from the deprivation or destruction of her property without due process of law." SMITH I, Second Amended Complaint, ¶ 15. In SMITH II, Smith alleged that the City violated "her rights to due process of law as secured by the Fifth and Fourteenth Amendments of the United States Constitution." SMITH II, Amended Complaint, ¶ 15.

In the case at bar, there is no evidence that Officer Alu intentionally destroyed Plaintiff's property. Assuming, arguendo, that Officer Alu mistakenly destroyed Plaintiff's property, Plaintiff has failed to cite any authority that stands for the proposition that Officer Alu's actions would constitute a violation by the City of Plaintiff's constitutional right to remain free from deprivation or de-

struction of property. Instead, Smith has produced evidence to support her contention that it was Officer Alu, and not her former boyfriend, Joseph, that ignited the explosion of gasoline, which Joseph had splashed around the house and on the police officers. Smith's primary contention is that "the City did nothing to train its police officers to recognize and properly handle hostage-taking situations and to protect the safety of innocent captives (such as Smith's decedents)."

In *Collins v. City of Harker Heights,* the United States Supreme Court noted that the Due Process Clause should not be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law. 503 U.S. at 128, 112 S.Ct. 1061. Accordingly, in *Skinner v. City of Miami,* the Eleventh Circuit emphasized that traditional tort law is beyond the scope of the Due Process Clause. 62 F.3d at 347 (quoting *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)) ("the Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society' "); *see Collins,* 503 U.S. at 128, 112 S.Ct. 1061.

It is difficult to distinguish Smith's claim from an ordinary tort claim for property damage: the City breached its duty of care toward preserving its citizens' property by failing to train its officers to deal with "barricaded hostage" situations. Smith has not met her burden of showing that the City has a Constitutional duty to preserve Smith's property under the conditions surrounding this case, or to train its officers to deal with "barricaded hostage" situations.

■ This Court should generally refrain, as a matter of policy, from expanding the scope of substantive due process. *Skinner,* 62 F.3d at 347 (quoting *Collins,* 503 U.S. at 125, 112 S.Ct. 1061). As the Supreme Court held in *Collins,* a presumption exists in favor of government programs:

Decisions concerning the allocation of resources to individual programs ... and to particular aspects of those programs ... involve a host of policy choices that must

be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.

503 U.S. at 128–29, 112 S.Ct. 1061.

Therefore, in light of the evidence presented, the Court finds that Smith did not have a substantive Constitutional right that the City violated.

### B. Municipal Liability: Violation of Substantive Due Process Right

Assuming, arguendo, that Smith has established a violation of a substantive due process right to have officers trained to deal with "barricaded hostage" situations or a right to remain free from the deprivation or destruction of her property, the Court finds that the City is not liable under § 1983 for such violation.

■ In order to reach the issue of municipal liability, the Court must first find the violation of a constitutional right. While a municipality can be sued in a § 1983 action, the municipality cannot be sued on a theory of respondeat superior for the injuries caused by its employees. *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. A municipality is only liable under § 1983 if its own "policy or custom," when executed by its officials, caused the constitutional violation. *Id.* at 694, 98 S.Ct. 2018. There are limited circumstances when a municipality may be held liable under § 1983 on the theory of "failure to train" its police officers. *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ If a plaintiff alleges liability on the theory of failure to train, that failure must amount to "deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197. As the U.S. Supreme Court explained:

it may happen that in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need ... *that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city ...*

*Id.* at 390–91, 109 S.Ct. 1197 (emphasis added). The determination involves considering the adequacy of the training program in relation to the tasks the particular officers must perform. *Id.* at 390, 109 S.Ct. 1197.

■ Smith has not met her burden of showing that the City's training program was inadequate in light of its officers' duties. Smith has not put forth evidence of the frequency with which officers are confronted with "barricaded hostage" situations, nor has she shown the extent of the existing training program. She has merely alleged that her substantive due process right was violated by "the City's policy of deliberate indifference to the preservation of the lives of innocent persons caught in 'barricaded hostage' environments." The bulk of Smith's evidence supports her contention that the explosion could have been avoided had Officer Alu been trained differently. The Supreme Court expressly rejected this type of claim in *Canton.* 489 U.S. at 391, 109 S.Ct. 1197 ("[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal").

In addition, the deficiency in the training program must be closely related to the ultimate injury: "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.* at 391, 109 S.Ct. 1197.

On the record, the Court cannot reasonably find that this alleged deficiency in the City's training program caused the accident. The officers received news of the hostage situation suddenly. From the time they arrived at Smith's home, to the time of the explosion, a total of 80 seconds had elapsed. They acted swiftly to save the lives of Smith's children, risking their own lives in the process. Based upon the undisputed facts, Smith has failed to persuade this Court that the need for better training was the cause of this tragic explosion.

In *County of Sacramento v. Lewis,* 523 U.S. ——, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court held that a police officer did not violate a plaintiff's Fourteenth Amendment guarantee of substantive due process by causing death through deliberate or reckless indifference to life while engaging in a high speed automobile chase. Plaintiff's are correct when they contend that "the *Lewis* decision addressed only a police officer's, but not a municipality's, liability under 42 U.S.C. § 1983 for injury and death inflicted during a high speed automobile case." Still, *Lewis* is instructive.

In *Lewis,* the Court carefully distinguished between situations such as a prison riot where prison officials are required to make split-second decisions and situations where prison officials have the luxury of having time to make unhurried judgments. *Id.* at ——, 118 S.Ct. at 1720. The *Lewis* Court also distinguished between cases in which the state affirmatively acted to restrain the individual's freedom to act on his own behalf either through incarceration, institutionalization or other similar restraint from cases where the individual is able to care for himself. *DeShaney v. Winnebago County Dept. of Social Serv.,* 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

Here, Officer Alu was confronted by an emergency situation that he did not precipitate. There is no evidence that Officer Alu caused Joseph to take Smith's children hostage. Joseph's outrageous behavior was instantaneous and Officer Alu's reaction was quick and instinctive. While one may, in retrospect, question Officer Alu's reaction, his reaction was to perform his job of saving lives, and not to induce Joseph's behavior or cause harm to Smith's children. There is no evidence to support Plaintiff's contention that the City could have trained Officer Alu to peacefully resolve this emergency situation.

It is equally probable that Joseph's actions, and not the City's failure to train Officer Alu, resulted in the deaths of Smith's children. Smith must also bear responsibility, at least in part, for her children's deaths because she was the one who originally brought Joseph into her home. Was there contributory fault on the part of Smith or Joseph? Did Smith assume the risk of this accident? "These are questions of tort law, not of constitutional governance." *Id.* at ——, 118 S.Ct. at 1725. If the people of Florida would prefer a system that holds municipalities liable for the consequences of barricade hostage situations then they may change Florida tort law in "accordance with the regulatory law making process." *DeShaney,* 489 U.S. at 203, 109 S.Ct. 998.

The U.S. Supreme Court has attached a high standard of fault to § 1983 cases against municipalities for "failure to train" in order to guide federal courts to refrain from "an endless exercise of second-guessing" municipal programs. *Id.* at 391–92, 109 S.Ct. 1197. Accordingly, this Court finds that Smith has failed to show that the City's alleged "failure to train" rises to the level of deliberate indifference to the rights of others. Therefore, the City is not subject to liability under § 1983.

## V. FLORIDA LAW TORT CLAIMS

### A. Contentions of the Parties

This Court has jurisdiction over Smith's Florida law tort claims of negligence and wrongful death against the City and Officer Alu, pursuant to 28 U.S.C. § 1367(a). The court will jointly examine Smith's Florida law tort claims: negligence in SMITH I, and wrongful death in SMITH II.

Smith claims that the City and Officer Alu had a duty to use reasonable care to protect and preserve Smith's residence from damage caused by the explosion and fire on July 25, 1995. Smith claims that the Defendants breached that duty by:

(a) failing to promptly summon to Plaintiff's residence a qualified hostage negotiator;

(b) failing to promptly summon to Plaintiff's residence a Special Weapons and Tactics ("SWAT") Team;

(c) failing to promptly summon to Plaintiff's residence emergency medical service personnel;

(d) failing to promptly summon to Plaintiff's residence fire department personnel;

(e) failing to promptly summon to Plaintiff's residence fire rescue personnel;

(f) confronting Mr. Steven Joseph in the back bedroom of Plaintiff's residence; and

(g) firing a pistol in a confined area known to be suffused with gasoline vapors.

SMITH I, Second Amended Complaint, ¶ 11, p. 7.

In SMITH I, Smith claims that Defendants' negligence caused Smith's home to be damaged by the explosion and fire and requests the costs of repairing her home. In SMITH II, Smith claims that Defendants' negligence caused the deaths of Smith's decedents and requests wrongful death damages.

Defendants claim that: (a) Under the Public Duty Doctrine, neither Defendant has a duty of care toward Smith, (b) Sovereign Immunity protects Officer Alu from suit, pursuant to Fla.Stat. § 768.28(9); and (c) Sovereign Immunity protects both Defendants from suit under the Discretionary Function Doctrine.

### B. Duty of Care

■ The starting point for the Court's inquiry is whether the Defendants had a duty of care to the Plaintiff. *Kaisner v. Kolb*, 543 So.2d 732, 733 (Fla.1989) (quoting *Williams v. State*, 34 Cal.3d 18, 22, 192 Cal.Rptr. 233, 664 P.2d 137 (Cal.1983))("conceptually, the question of the applicability of ... immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity"); *Trianon Park Condo. Assoc. v. City of Hialeah*, 468 So.2d 912, 916 (Fla.1985) ("[f]irst, for there to be governmental tort liability, there must be either an underlying common law or statutory duty of care with respect to the alleged negligent conduct"). Florida tort law provides that there are some governmental acts to which a duty of care does not apply. *Trianon*, 468 So.2d at 917. This is the Public Duty Doctrine.

■ Under the Public Duty Doctrine, a plaintiff suing a governmental entity in tort must allege and prove that the defendant owed a duty of care to the plaintiff, individually, rather than to the public, in general. *Seguine v. City of Miami*, 627 So.2d 14, 16 (Fla. 3d DCA 1993). This doctrine is founded on the need to protect the government's treasury and the need to prevent potential tort liability from having a "chilling" effect on law enforcement processes. *Id.*

■ A law enforcement officer's duty to protect citizens is a general duty that is owed to the public at large. *Everton v. Willard*, 468 So.2d 936, 937 (Fla.1985). Moreover, under Florida law, where a citizen falls victim to a criminal offense that might have been prevented through reasonable law enforcement action, a law enforcement officer has no common law duty of care to that individual citizen and, therefore, no resulting tort liability, absent a special relationship to the victim. *Everton*, 468 So.2d at 937 (citing *South v. Maryland*, 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1855)).

■ Here, Smith called for police help when her estranged, mentally disturbed former boyfriend, Joseph, arrived at her home with a can of gasoline, a lighter, and a machete, and threatened to kill Smith and her children. Absent a special relationship to Smith, Florida law does not place liability on an officer who in the course of performing his job attempts but fails to rescue a person from a danger caused by a third party. This is especially so in an emergency situation. If Florida law were otherwise, there would be little incentive for an officer to risk his life to rescue a person.

■ Smith has the burden of establishing that officer Alu had a special relationship with Smith. Florida law has recognized a special relationship to exist when the law enforcement officer places the plaintiff in "custody" of some sort. *Kaisner*, 543 So.2d at 734. Custody is broadly defined to mean "the detainer of a man's person by virtue of lawful process or authority ... [custody] may mean actual imprisonment of physical detention or mere power, legal or physical, of imprisoning or of taking manual possession." *Kaisner*, 543 So.2d at 734 (quoting Black's Law Dictionary 347 (5th ed.1979) (defining

"custody" as any form of detention, not necessarily a formal arrest)).

■ Officer Alu did not exert any type of power, legal or physical, over Smith or her residence. He had no prior dealings with Smith, and was at her home for a total of 80 seconds prior to being caught in the gasoline explosion in her home. Even in light of the Florida Supreme Court's expansive definition of "custody," the Court finds that Officer Alu did not place Smith in his custody, and had no special relationship toward Smith that would create a duty of care, an essential element of Smith's tort claims. Hence, under Florida common law, neither Officer Alu nor the City is subject to tort liability for the actions taken by Officer Alu when he responded to Smith's call for police assistance. *Accord Seguine*, 627 So.2d at 16–19.

"A court must find no liability as a matter of law if either (a) no duty of care existed, or (b) the doctrine of governmental immunity bars the claim." *Kaisner*, 543 So.2d at 734. Because this Court finds that no duty of care existed, the Court must find no liability in tort as a matter of law. This Court will nonetheless address the issue of governmental immunity.

### C. Governmental Immunity

■ The doctrine of governmental immunity is rooted in the separation of powers principle that "the judiciary is ill-equipped to interfere in the fundamental processes of the executive and legislative branches." *Kaisner*, 543 So.2d at 733; *Seguine*, 627 So.2d at 19.

2. Fla.Stat. § 768.28(1) provides, in pertinent part:

In accordance with s. 13, Art. X, State Constitution, the state, for itself and for its agencies or subdivisions hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act. Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the

#### 1. Official Immunity: Fla.Stat. § 768.28(9)

Generally, the state and its subdivisions, including municipalities, are sovereignly immune from tort liability unless such immunity is expressly waived by statute. *Seguine*, 627 So.2d at 16. Florida Statute § 768.28 expressly waives sovereign immunity for the state of Florida and its subdivisions, but preserves immunity for the officers of the state and its subdivisions. Fla.Stat. § 768.28(1),[2] (9).[3]

■ Smith does not dispute the applicability of Fla.Stat. § 768.28(9). Rather, Smith argues that Officer Alu has waived his sovereign immunity because he initiated a negligence suit for damages against Smith before Smith brought the present suits. She claims that Officer Alu waived his sovereign immunity, pursuant to Fla.Stat. § 768.14, which provides that "[s]uit by the state or any of its agencies or subdivisions to recover damages in tort shall constitute a waiver of sovereign immunity from liability and suit for damages in tort ..." Fla.Stat. § 768.14. However, this statute, on its face, clearly applies only to the state and its subdivisions. Smith has not established that, as a matter of law, Fla.Stat. § 768.14 applies to officers of the state and its subdivisions. Therefore, the Court finds that, as a matter of law, Officer Alu is immune pursuant to Fla.Stat. § 768.28(9).

#### 2. The Discretionary Functions Doctrine

■ Moreover, in *Kaisner*, the Florida Supreme Court held that although the state

claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act ...

3. Fla.Stat. § 768.28(9) provides, in pertinent part:

No officer, employee, or agent of the state or of any of its subdivisions shall be held liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property ... Fla.Stat. § 768.28(9)(a).

of Florida has waived sovereign immunity for any act for which an individual in similar circumstances could be held liable, the doctrine of Separation of Powers necessitates the recognition of a sphere of governmental activity that is immune from suit. *Kaisner*, 543 So.2d at 733; Fla.Stat. § 768.28(1).

■■■ In deference to the judgments of the legislative and executive branches, tort liability does not apply when the act of a government or its agent is termed, "discretionary," rather than "operational." *Kaisner*, 543 So.2d at 735. The determination of whether an act falls within the scope of this Discretionary Functions Doctrine rests on the question of whether intervention by the court would "inappropriately ... entangle itself in fundamental questions of policy and planning." *Kaisner*, 543 So.2d at 736.

■■■ To determine whether an act is "discretionary" or "operational," Florida courts customarily apply a four-prong analysis. *Kaisner* 543 So.2d at 736 (quoting *Commercial Carrier v. Indian River County*, 371 So.2d 1010, 1019 (Fla.1979)). However, the Florida Supreme Court has created an exception for police action in emergency situations. *City of Pinellas Park v. Brown*, 604 So.2d 1222, 1226, (Fla.1992) (citing *Kaisner*, 543 So.2d at 738, n. 3) ("*Kaisner* specifically noted that special deference is given to pressing emergencies, and that certain police actions may involve a level of such urgency as to be considered discretionary and not operational"). As the court explained in *Pinellas Park v. Brown:*

> To fall within the *Kaisner* exception, the serious emergency must be one thrust upon the police by lawbreakers or other external forces, that requires them to choose between different risks posed to the public. In other words, no matter what decision police officers make, someone or some group will be put at risk; and officers thus are left no option but to choose between two different evils. It is this choice between risks that is entitled to the protection of sovereign immunity in appropriate cases, because it involves what essentially is a discretionary act of executive decision-making.

*Pinellas Park*, 604 So.2d at 1226.

In the present case, the undisputed facts show that (a) a serious emergency existed, (b) the emergency was thrust upon the police by the acts of others, and (c) Officer Alu was required to make split-second choices that could result in harm either way. Had Officer Alu taken all of the steps suggested by Smith, he would have left Smith's children at risk inside the house. The undisputed facts reveal that the children were in imminent danger of being set on fire by Joseph when Officer Alu arrived on the scene. Moreover, Officer Alu had *no prior notice* of the situation. Therefore, this case falls within the emergency exception, and involves a discretionary function. In *Seguine*, the court commented on the magnitude of the decision that a police officer faces when arresting a dangerous suspect who is holding hostages. 627 So.2d at 19. As the court aptly noted:

> We think it best that such delicate law enforcement decisions be left to the discretionary judgment of the police without entangling the courts through our tort law in such fundamental law enforcement policies—even where, as here, that judgment might in hindsight be arguably faulted either in whole or in part.

*Id.*

Accordingly, the Court finds that to second-guess the decisions of Officer Alu would inappropriately entangle this Court in fundamental law enforcement policies. Therefore, under the Discretionary Functions Doctrine, both Officer Alu and the City are sovereignly immune from Smith's negligence suit.

### CONCLUSION

Based upon the foregoing, it is

**ORDERED AND ADJUDGED** that Defendant's, CITY OF PLANTATION, Motion for Summary Judgment is GRANTED. It is further

**ORDERED AND ADJUDGED** that Defendant's, JOSEPH ALU, Motion for Summary Judgment is GRANTED. It is further

**ORDERED AND ADJUDGED** that this CASE IS CLOSED. It is further

ORDERED AND ADJUDGED that all pending motions are DENIED AS MOOT.